**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FRITZ RINGLING, derivatively on behalf of J2 GLOBAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VIVEK SHAH, NEHEMIA ZUCKER, R. SCOTT TURICCHI, DOUGLAS Y. BECH, SARAH FAY, W. BRIAN KRETZMER, JONATHAN F. MILLER, RICHARD S. RESSLER, and STEPHEN ROSS, <br><br> Defendants, <br><br> and <br><br> J2 GLOBAL, INC., <br><br> Nominal Defendant. | Case No: 1:21-cv <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Fritz Ringling  ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant J2 Global, Inc. ("J2 Global," "J2," "or the "Company") against the Individual Defendants (as defined below) seeking to remedy their breaches of fiduciary duties and other violations of law from October 5, 2015 to June 29, 2020 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of his undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by J2 Global with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by J2 Global; (c) review of news

1

articles, stockholder communications, and postings on J2's website concerning the Company's public statements; (d) pleadings, papers, and documents from a related pending consolidated securities fraud class action pending in the United States District, Central District of California, captioned, *Garcia v. J2 Global Inc. et al.,* Case No. Case No. 2:20-cv-06096 (the "Securities Class Action"); and (e) review of other publicly available information concerning J2 Global and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain current and former officers and members of J2 Global's Board of Directors (the "Board").

2.      J2 purports to be a leading Internet information and services company consisting of a portfolio of brands in its two divisions: Digital Media and Cloud Services. The Company relies primarily on acquisitions for growth, having deployed approximately $3 billion of acquisition capital to acquire 186 businesses since its founding in 1995.

3.      J2 is in the business of buying companies that are already generating revenue and combining them with companies in similar or the same industry to effectuate synergies and/or cost savings; J2 is not in the business of buying undervalued companies and adding value to, or otherwise organically operating and growing, those individual companies. Accordingly, the Company's success requires paying fair market value or less to acquire companies and for those companies to continue to be at least as profitable as when J2 acquires them.

4.      The breaches of fiduciary duty and other violations of law alleged herein relate to the Individual Defendants (as defined herein) using improper accounting practices to obscure the Company's financial condition, misleadingly touting the mergers and acquisitions ("M&A")

program's success, deceptively describing the Company's practice of buying flagging businesses as a "shrink to grow" strategy, and failing to disclose, or minimizing, the conflicts of interest plaguing certain directors, including a $200 million insider transaction to an investment fund connected to Chairman of the Board Richard S. Ressler ("Ressler").

5.      In spite of their fiduciary duties as officers and directors of J2, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects.

6.      Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them neither independent nor disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties. Also, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an

adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

7.      Furthermore, the Individual Defendants breached their fiduciary duties and wasted corporate assets by allowing the Company to engage in egregious related party transactions that unjustly enriched certain of the officers and directors at the expense of the Company. In connection therewith, the Company insiders that benefited from the wrongful related party transactions were unjustly enriched.

8.      As alleged herein, the Individual Defendants misled the investing public about the strength of J2's core business of acquiring and integrating companies. Many of J2's acquisitions actually just enriched insiders, including purported "independent" board members and senior executives, by tens of millions of dollars, all to the detriment of J2's shareholders and the Company.

9.      Furthermore, the Individual Defendants obscured the terms of those acquisitions as well as any of the individual acquired companies' ongoing value and growth – or lack thereof. Normally, a company publicly reports goodwill as an asset in relation to an acquisition or other business segment. If that acquisition or segment subsequently suffers and loses value, the company would report an impairment to the goodwill. J2, however, does not break out the goodwill for each of its hundreds of acquisitions individually and instead reports a single consolidated goodwill for each of its two divisions, without any impairments. In fact, J2 has never taken a goodwill impairment.

10.     Meanwhile, the Individual Defendants portrayed J2's aggressive acquisition strategy as consistently successful. Through this scheme—*i.e.*, concealing losses associated with individual acquisitions, while publicly touting the success of its zealous acquisition strategy, all

while failing to disclose the insider nature of some of these transactions—the Individual Defendants misrepresented J2's true health as a business and its business model. In reality, most of its acquisitions involved overpaying for stagnant, hollow, or otherwise unprofitable companies. Simply put, J2 has touted a strategy of acquiring solid companies capable of independent organic growth and successfully integrating them with companies in the same or similar industry, whereas the truth is that J2 frequently merely acquired junk, to enrich the Individual Defendants and their associates.

11.     The scheme began on October 5, 2015, when the Individual Defendants caused J2 to announce in a press release that it had completed nine acquisitions in the third quarter of 2015 ("3Q15"), including the intellectual property of "VDW (Netherlands)" (the "VDW Acquisition"). What the Individual Defendants failed to disclose was that the VDW Acquisition was of an eleven-month-old consulting business registered to the personal residence of a long-time Company corporate insider, former Vice President ("VP") of Corporate Development Jeroen van der Weijden ("van der Weijden"), and had no other employees, and was basically a $900,000 gift using Company funds.

12.     In May 2014, van der Weijden had become a director of J2 Global UK Ltd. ("J2 UK"), an arm of J2 Global Ireland Limited ("J2 Ireland"), which was ultimately owned by J2. He started VDW just six months later and proceeded to orchestrate the VDW Acquisition ten months later, while working for J2. No conflict was ever disclosed by the Company to its investors.

13.     As subsequently revealed, van der Weijden sourced and handled dozens of acquisitions by J2 – to the tune of over 135 of J2's 186 transactions. Incredibly, his incentive package was based on the number of deals he closed, rather than on the propriety of the transactions. Consequently, he was incentivized to close deals regardless of whether they were in

the best interest of J2. In other words, regardless of whether J2 overpaid, the acquisition enriched van der Weijden at J2's expense. While the Individual Defendants touted a strategy of successful acquisitions of profitable companies posing organic growth, van der Weijden focused solely on the number of deals, as well as insider transactions for personal profit.

14.     But van der Weijden was just one component of J2's rampant, improper insider dealings. In 2017, J2's Board authorized the use of shareholder funds to invest $200 million in a fund associated with Orchard Capital Corp. ("Orchard Capital"). Orchard Capital is an investment venture founded by Defendant Ressler. It has also paid Defendant Brian Kretzmer ("Kretzmer"), a J2 Board member and chair of its Audit Committee, to do merger & acquisition ("M&A") work. As part of the deal, J2 provided nearly 77% of the fund's equity. Yet Defendant Ressler remains Orchard Capital's majority equity owner and has "continue[d] to oversee companies in which Orchard" Capital or its affiliates invest. Furthermore, J2 paid an Orchard Capital affiliate – the principals of whom are Defendant Nehemia ("Hemi") Zucker, Defendant Ressler, and Zohar Loshitzer ("Loshitzer"), J2's Executive Vice President ("EVP") of Corporate Strategy, – over $65 million in management fees across 2018 and 2019. Multiple J2 insiders enriched themselves in connection with Orchard Capital and that transaction with J2.

15.     The Orchard Capital affiliate that received $65 million was in the same business as J2—investing in and acquiring companies—but it had a thin investing record comprised of primarily failed companies. And those companies also had Defendant Zucker, Defendant Ressler, Loshitzer and/or their associates in executive or Board positions. The transaction created no observable benefit to J2's shareholders or J2, but enriched J2 insiders.

16.     In addition to concealing related party transactions, the Individual Defendants concealed the underperformance of acquired assets – particularly international ones. The

Company's goodwill should rise and fall with the value of acquired businesses, yet the Individual Defendants steadfastly refused to take impairments or otherwise disclose the underperformance of the acquired businesses in J2's financial statements – notwithstanding how the acquired companies perform. The lack of impairments misleadingly signaled to investors that the acquisitions were properly valued and performing well.

17.     For example, J2 Ireland took a €22.1 million charge in 2015 and subsequently saw its revenue decline 27% over the following three years, with operating income plummeting from €5.2 million to negative €11.5 million.  Yet J2, as the parent company, has taken no related goodwill charge and has made no related disclosures in its financial statements. Similarly, the revenue of J2's largest acquisition ever – Everyday Health Group ("Everyday Health") – tanked over 32% in the first year after being acquired, with its value decreasing from $254 million to $171 million. It has yet to reach pre-acquisition levels despite five subsequent acquisitions – and their revenues – being folded into the division. But the Individual Defendants did not write off any of the $27 million in now worthless goodwill that J2 recorded at the time of the Everyday Health acquisition.

18.     Instead of providing the truth owed to investors and the investing public, the Individual Defendants obscured the real performance of acquired companies and, in turn, the flaws in J2's acquisition system. Using writeoffs, divestures, and acquisitions at the subsidiary or division level, the Individual Defendants concealed information about the specific performance of any individual acquisition, leaving the market in the dark about the true strength of J2's acquisition system –touted by Defendant Vivek Shah ("Shah"), the Company's Chief Executive Officer ("CEO"), as the Company's "single great competitive advantage."

19.     Indeed, what the Individual Defendants portrayed as a strong system of vetting, acquiring, and integrating organically growing businesses was actually a scattershot approach of purchasing anything for any price while enriching insiders and banking on the success of enough of the acquired companies to conceal the enormous failure of the others. This actual strategy was never disclosed to investors, and represents a drastic divergence from the strategy touted by the Individual Defendants.

20.     On June 30, 2020, the truth was revealed when Hindenburg Research published a report entitled "J2 Global: Troubling Related Party Transactions, Looming Impairments and A Suspicious History of Insider Enrichment Spanning Decades" (the "Hindenburg Report"). The Hindenburg Report revealed that J2 had, among other issues: (i) misrepresented and/or failed to disclose that its "opaque acquisition approach has opened the door to egregious insider self-enrichment," including Zucker, and "found obvious red flags" which called into question "every one of the 135 deals" that van der Weijden oversaw; (ii) "masked" the underperformance of acquisitions by utilizing "tricky accounting" such as "multiple material goodwill impairments [in subsidiary filings] that don't appear to coincide with parent financials" and "[o]bfusact[ing]" the financials of J2's largest acquisition, Everyday Health "Through A Series of Acquisitions and Divestures"; and (iii) failed to disclose "decades of intertwined financial interests between board members and executives," which called their "independence into question."

21.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, J2 has sustained damages as described below.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Securities & Exchange Act of 1934 (the "Exchange Act") because the claims asserted herein arise under Section 14(a) of the Exchange Act and Rule 14a-9.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     The Court has personal jurisdiction over each of the Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because J2 is incorporated in this District. In addition, the Defendants have conducted business in this District, and the Defendants' actions have had an effect in this District.

## PARTIES

27.     Plaintiff Fritz Ringling is a stockholder of J2, was a stockholder of J2 at the time of the wrongdoing alleged herein and has been a stockholder of J2 continuously since that time. Plaintiff has held J2 common stock since 2000 and was previously a shareholder of eFax.com Inc., from at least 1988 until eFax.com, Inc. was acquired by J2 in 2000.

28.     Nominal Defendant J2 Global is a Delaware corporation with its principal executive offices at 700 S. Flower Street, 15th Floor, Los Angeles, California 90017.

29.     Defendant Shah has served as the Company's CEO and as a Company director since January 2018. He previously served as the CEO of Ziff Davis—a company acquired by J2 Global

in 2012. For fiscal years ended 2019 and 2018 Defendant Shah received $2,151,811 and $45,062,153, respectively, in compensation from the Company.

30.     Defendant Zucker co-founded the Company, served as the Company's CEO from May 2008 until he resigned effective December 31, 2017, and served as an advisor to the Company through December 31, 2018. Prior to that he had served in various management roles including as J2's President, Chief Operating Officer ("COO"), and Chief Financial Officer ("CFO").

31.     Defendant R. Scott Turicchi ("Turicchi") has served as the Company's CFO and President since 2008. Prior to that, he held various management roles at J2, including CFO, Co-President and President. For fiscal years 2019 and 2018, Defendant Turicchi received $4,351,782 and $4,177,613, respectively, in compensation from the Company.

32.     Defendant Douglas Y. Bech ("Bech") has served as a Company director since November 2000. For fiscal years ended 2019 and 2018, Defendant Bech received $300,069, and $299,938, respectively, in compensation from the Company.

33.     Defendant Sarah Fay ("Fay") has served as a Company director since February 2018. For fiscal years ended 2019 and 2018, Defendant Fay received $270,069 and $269,938, respectively, in compensation from the Company.

34.     Defendant Kretzmer has served as a Company director since July 2007. For fiscal years ended 2019 and 2018 Defendant Kretzmer received $295,069 and $294,938, respectively, in compensation from the Company.

35.     Defendant Jonathan F. Miller ("Miller") has served as a Company director since February 2015. For fiscal years ended 2019 and 2018 Defendant Miller received $270,069 and $269,938, respectively, in compensation from the Company.

36.     Defendant Ressler has served as the Chairman of the Board and as Company director since 1997. He previously served as the Company's CEO from 1997 through 2000.  For fiscal year 2019 and 2018 Defendant Ressler received $476,069 and $475,938, respectively, in compensation from the Company.

37.     Defendant Stephen Ross ("Ross") has served as Company director since July 2007. For fiscal year ended 2019 and 2018 Defendant Ross received $270,069 and $269,938, respectively, in compensation from the Company.

38.     Defendants Shah, Zucker, Turicchi, Bech, Fay, Kretzmer, Miller, Ressler, and Ross are referred to herein as the "Individual Defendants."

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers, directors and/or fiduciaries of J2 Global and because of their ability to control the business and corporate affairs of J2 Global, the Individual Defendants owed J2 Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage J2 Global in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of J2 Global and its shareholders so as to benefit all shareholders equally.

40.     Each director and officer of the Company owes to J2 Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of J2 Global, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of J2 Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of J2 Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware that they posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised J2 Global's Board at all relevant times.

44.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

45.     To discharge their duties, the officers and directors of J2 Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of J2 Global were required to, among other things:

    a.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    b.  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c.  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    e.  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

    46.  Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47.     The Company has adopted J2 Global's Code of Business Conduct and Ethics (the "Code"), which provides that "[a]ll employees and members of our Board of Directors (each a "director") are expected to adhere to those principles and procedures set forth in this Code that apply to them."

48.     The Code states in pertinent part:

This Code of Business Conduct and Ethics (the "Code") embodies the commitment of J2 Global, Inc. and its subsidiaries (the "Company") to conduct our business in accordance with all applicable laws, rules and regulations and the highest ethical standards.

49.     The Code goes on to state:

A "personal conflict of interest" occurs when an individual's private interest improperly interferes with the interests of the Company. Personal conflicts of interest are prohibited as a matter of Company policy, unless they have been approved by the Company. In particular, an employee or director must never use or attempt to use his or her position at the Company to obtain any improper personal benefit for himself or herself, for his or her family members, or for any other person, including loans or guarantees of obligations, from any person or entity. Service to the Company should never be subordinated to personal gain and advantage. Conflicts of interest should, to the extent possible, be avoided. Any employee or director who is aware of a material transaction or relationship that could reasonably be expected to give rise to a conflict of interest should discuss the matter promptly with an Appropriate Ethics Contact.

***

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee and director to adhere to the standards and restrictions imposed by those laws, rules and regulations.

*** 

Employees and directors owe a duty to the Company to advance the Company's legitimate business interests when the opportunity to do so arises. Employees and directors are prohibited from taking for themselves (or directing to a third party) a business opportunity that is discovered through the use of corporate property, information or position, unless the Company has already been offered the opportunity and turned it down. More generally, employees and directors are prohibited from using corporate property, information or position for personal gain or competing with the Company. Sometimes the line between personal and Company benefits is difficult to draw, and sometimes both personal and Company benefits may be derived from certain activities. The only prudent course of conduct for our employees and directors is to make sure that any use of Company property or services that is not solely for the benefit of the Company is approved beforehand through the Appropriate Ethics Contact.

50.     Moreover, during the Relevant Period the purpose of the Audit Committee, comprised of Defendants Miller, Ross and Kretzmer  (the "Audit Committee Defendants"), was to "assist the Board: 1) in its oversight of the Company's accounting and financial reporting principles and policies and internal audit controls and procedures; 2) in its oversight of the Company's financial statements and the independent audit thereof; 3) in selecting, evaluating and, where deemed appropriate, replacing the independent auditors (or nominating the independent auditors to be proposed for shareholder approval in any proxy statement); and 4) in evaluating the independence of the independent auditors."

51.     To that end, per the Audit Committee Charter, the Audit Committee Defendants were responsible for, in pertinent part:

with respect to the independent auditors,

to keep the independent auditors informed of the Audit Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company, and to review and discuss with the independent auditors such auditors' evaluation of the Company's identification of, accounting for and

disclosure of its relationships and transactions with related parties, including any significant matters arising from the annual audit regarding the Company's relationships and transactions with related parties;

\*\*\*

with respect to accounting principles and policies, financial reporting and internal control over financial reporting,

(i)     to advise management, the internal auditing department and the independent auditors that they are expected to provide to the Audit Committee a timely analysis of significant issues and practices relating to accounting principles and policies, financial reporting and internal control over financial reporting;

(ii)     to consider any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Audit Committee by the independent auditors required by or referred to in applicable PCAOB or other applicable standards, including reports and communications related to:

- the overall audit strategy, including the timing of the audit, significant risks the independent auditors identified, and significant changes to the planned audit strategy or identified risks;

- the extent to which the independent auditors intend to use the Company's internal auditors in the audit;

- deficiencies, including significant deficiencies or material weaknesses, in internal control identified during the audit or other matters relating to internal control over financial reporting;

- consideration of fraud in a financial statement audit;

- detection of illegal acts;

- the independent auditors' responsibility under generally accepted auditing standards;

- any restriction on audit scope;

- significant accounting policies;

- significant issues discussed with the national office respecting auditing or accounting issues presented by the engagement, or other

difficult or contentious matters for which the independent auditors have consulted outside the engagement team;

- a description of the process used to develop critical accounting estimates, including the significant assumptions underlying highly subjective estimates;

- any accounting adjustments arising from the audit that were noted or proposed by the auditors but were passed (as immaterial or otherwise);

- the responsibility of the independent auditors for other information in documents containing audited financial statements;

- disagreements with management;

- consultation by management with other accountants; information about other accounting firms or other persons performing audit procedures, and the basis upon which the independent auditors can serve as principal auditor if significant parts of the audit will be performed by other auditors;

- major issues discussed with management prior to retention of the independent auditor;

- difficulties encountered with management in performing the audit;

- the independent auditor's judgments about the quality of the entity's accounting principles;

- reviews of interim financial information conducted by the independent auditor;

- the responsibilities, budget and staffing of the Company's internal audit function;

- significant transactions that are outside the ordinary course of business or unusual; and

- other matters arising out of the audit that are significant to the oversight of the company's financial reporting process, including complaints or concerns regarding accounting or auditing matters that have come to the independent auditors' attention;

(iii)   to meet with management, the director of the internal auditing department and/or the independent auditors:

- to discuss the scope of the annual audit;

- to discuss the audited financial statements and quarterly financial statements and related reports, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- to discuss any significant matters arising from any audit or report or communication referred to in items 2(ii) or 3(ii) above, whether raised by management, the internal auditing department or the independent auditors, relating to the Company's financial statements;

- to discuss any difficulties the independent auditors encountered in the course of the audit, including any restrictions on their activities or access to requested information and any significant disagreements with management;

- to discuss any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company;

- to review the form of opinion the independent auditors propose to render to the Board and shareholders; and

- to discuss, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; (iv) to inquire of the Company's chief executive officer/president and chief financial officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether

or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting;

(iv)     to discuss guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company assess and manage the Company's exposure to risk, and to discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

(v)      to obtain from the independent auditors assurance that the audit was conducted in a manner consistent with Section 10A of the Exchange Act, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under the Exchange Act;

(vi)     to discuss with the Company's General Counsel any significant legal, compliance or regulatory matters that may have a material effect on the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;

(vii)    to discuss and review the type and presentation of information to be included in earnings press releases;

(viii)   to discuss the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies;

(ix)     to establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters; and

(x)      to establish hiring policies for employees or former employees of the independent auditors.

52.     With respect to risk management, the Company's proxy statement filed March 26, 2020 with the SEC ("2020 Proxy") states:

The Board of Directors plays an active role, as a whole and also at the committee level, in overseeing management of J2 Global's risks and strategic direction. The Board of Directors regularly reviews information regarding J2 Global's liquidity and operations, as well as the risks associated with each. J2 Global's Compensation Committee is responsible for overseeing the management of risks relating to J2

19

Global's executive compensation plans and arrangements. The Audit Committee oversees the process by which J2 Global's senior management and the relevant departments assess and manage J2 Global's exposure to, and management of, financial risks. The Corporate Governance and Nominating Committee manages risks associated with the independence of the Board of Directors and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board of Directors is regularly informed about such risks.

## SUBSTANTIVE ALLEGATIONS

53.     J2 Global, together with its subsidiaries, provides Internet services worldwide. Specifically, through its Cloud Services business, the Company offers cloud-based subscription services, as well as fax, security, privacy, data backup, email marketing, and voice products support services to businesses and consumers. Through its Digital Media business, the Company also maintains a portfolio of various web properties and apps, such as IGN, Mashable, PC Mag, AskMen, and Everyday Health, which primarily generate revenue through advertising, sponsorships, subscription fees, and licensing fees.

54.     J2 also purports to be an active acquirer of businesses in media, technology and Internet services.  J2 Global has acquired approximately 186 businesses since the Company was founded in 1995.

55.     J2's business model relies heavily on acquisitions for growth. Its success requires paying fair market value to acquire companies and for those companies to continue to be at least as profitable as when J2 values and acquires them. Notably, even though J2 has engaged in extensive acquisitions over the years, J2 has never taken a goodwill impairment related to any of its acquisitions. This demonstrated to investors that the Company had either never overvalued goodwill at the time of purchase and/or the acquired assets have never underperformed their expectations.

56.     Unbeknownst to investors, however, while the Individual Defendants touted the success of J2's aggressive acquisition strategy, the truth is that many of these transactions were non-profitable related party transactions that misrepresented J2's true health as a business. Specifically, many of these acquisitions involved overpaying for essentially unprofitable companies that unjustly enriched Company insiders, including certain of the Individual Defendants.

**A. Statements Made By Former Employees As Described in the Securities Class Action[1] Confirm that the Individual Defendants Hid Material Information Regarding J2's Transactions**

57.     Former Employee 1 ("FE1") worked at J2 from January 2015 to April 2017, as a General Manager and then was later promoted at the end of 2015 to Managing Director, Australia & New Zealand.

58.     In this role, FE1 worked with long time Company insider, van der Weijden when he came to Australia for meetings. It was FE1's understanding that van der Weijden was responsible for identifying potential mergers and acquisitions at the Company.

59.     FE1 was also informed that that van der Weijden's incentive package was structured to reward van der Weijden based on the number of deals that he closed. It did not matter whether the acquisition was good or made sense, just that the acquisition had to be approved by the Board. FE1 stated that van der Weijden's incentives did not always line up with J2's goals as

---

[1] The misconduct at issue here led to the filing of the Securities Class Action which names J2 and Defendants Shah, Zucker, and Turicchi as defendants. On November 19, 2020, the lead plaintiff in the Securities Class Action filed a Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Consolidated Securities Complaint" or "CSC"). The CSC includes the accounts of several former employees ("FEs") that assist in substantiating Plaintiff's allegations of the misconduct of the Individual Defendants in this action. Any references to FEs in this derivative complaint come from the Consolidated Securities Complaint.

a company, but it was well known around the Company that this was his role and he was doing exactly what Defendant Zucker wanted him to do.

60.     According to FE1, van der Weijden's incentive structure was concerning because at J2, information flow from acquisition to integration was limited and the practice was to just hand the acquired company to the person responsible for that area. In FE1's opinion, J2 was "atrocious" about acquisitions and not integrating them at the global level. FE1 confirmed that J2 followed some of the methods and approaches of private equity firms when acquiring companies, but not when it came to the integration. Accordingly, people in similar roles as van der Weijden at private equity firms are typically required to take more of an operating role in the newly acquired company so that they are involved in the integration, ensuring the knowledge obtained while conducting due diligence on the business and competition is retained by the new business. In contrast, however, at J2 van der Weijden did not have to be around to clean up the mess if an acquisition proved unsuccessful.

61.     The Company acquired at least three businesses, including Web24 and AUSweb, that highlighted this problem. It was FE1's opinion that the Company paid too much for Web24. As for AUSweb, FE1 believed that van der Weijden overvalued the company because the income information van der Weijden reviewed at the time he was vetting the deal was outdated as the company had been moving its customer base, and the income information was not re-reviewed at the time of the acquisition. FE1 was just told the deal was done and to integrate it, which FE1 did, and only then learned later that revenues were not what van der Weijden said they were. FE1 made the decision to shut down the AUSweb brand after tracking customer revenues and subscription revenues for 12 months, and integrated everything into Web24.

62.     FE1 was told not to talk publicly about new acquisitions, how much was paid for them, or how they were performing. FE1 was further told that not publicly talking about new acquisitions was intentional and deliberate by the Board because then, analysts could not track individual entities, they would have to track the consolidated entity.

**B.  J2 Engages in Undisclosed Related Party Transactions Involving van der Weijden**

63.     According to van der Weijden's personal LinkedIn profile, van der Weijden was the VP of Corporate Development of J2 from September 2009 to August 2018. During his tenure, at the Company he purportedly "[m]anag[ed] client relationships at the C-level, including the identification and pursuit of new business opportunities via existing networks, as well as through developing new relationships and providing technical valuation advice."

64.     Van der Weijden also purportedly "[s]ourc[ed] and handl[ed] over 135 M&A transactions, while managing all aspects of the acquisition process from scoping, planning, execution, follow-up and reporting." Based on J2 having purportedly acquired 186 businesses since 1995, van der Weijden has personally sourced and handled nearly 73% of the Company's acquisitions.

65.     In March 2004, J2 paid between $1 to $2 million to acquire Jump B.V., a Netherlands-based provider of fax-to-email and unified messaging services founded by van der Weijden. In March 2014, Jump was reorganized as J2 Global (Netherlands) B.V. and registered to van der Weijden's personal residence (Pieter Pauwstraat 2 A-I 1017ZJ Amsterdam).

66.     During the third quarter of 2015, J2 acquired the intellectual property of "VDW (Netherlands)," at which time van der Weijden was its sole employee and was barely in the process of commencing its licensing program. J2 disclosed this information in an October 5, 2015 press release announcing the acquisition of nine businesses, which "will grow the Company's global

customer base, provide access to new markets and expand J2's product lineup." The press release simply listed "VDW (Netherlands)" under "Intellectual Property." There was no mention of the conflict by van der Weijden's involvement or that van der Weijden was a Company insider.

67.     In response to the Hindenburg Report, J2, on June 30, 2020 and for the first time, confirmed that it had paid van der Weijden an estimated $900,000 for "Intellectual Property." However, Dutch records show that at the time of purchase VDW had zero employees other than van der Weijden, that its activities included the "[m]anagement and operational management consultancy," and that it was dissolved in October 2019, shortly after van der Weijden left J2. van der Weijden bought a $2.5 million dollar home in California just one month after the acquisition of VDW.

68.     The Company claimed in defense to the Hindenburg Report, that van der Weijden was an outside consultant from 2004 until the Company acquired his consulting business in 2015, after which he became a full-time employee of J2. However, publicly available documents show that from May 2014 to January 2016, van der Weijden was a director of J2 UK, an arm of J2 Ireland, which was ultimately controlled by J2. Indeed, van der Weijden signed the Company's statement of director responsibilities on March 6, 2015 "on behalf of the board" of J2 UK.

69.     Put simply, van der Weijden set up his consulting company just six months after becoming a director of a J2 subsidiary, and almost a year later, while still a director of that J2 subsidiary, sold that new business, with no employees, and no office, to J2 for the sum of $900,000.

70.     The Board never disclosed at that time that the VDW Acquisition was a related party transaction even though they had a fiduciary duty to do so.

## C. J2 Global Enters into an Undisclosed Related Party Transactions Involving Defendants Ressler and Approved by a Board that Is Not Independent

71.     Defendant Ressler is the Chairman of the Board and has been a director of J2 Global since 1997, and served as J2 Global's CEO from 1997 to 2000.

72.     Ressler is the majority equity holder of the investment fund OCV Fund I, LP's (the "Fund") General Partner, OCV I GP, LLC ("OCV I"). He is also the majority equity holder of the Fund's manager, OCV Management, LLC ("OCV").

73.     According to Ressler's biography on J2's website "he is the founder and President of Orchard Capital, a firm through which Mr. Ressler oversees companies in which Orchard Capital or its affiliates invest."

74.     On September 25, 2017, the Board and the Audit Committee caused the Company to invest $200 million into a fund managed by OCV, a fund in which Defendant Ressler was a majority equity holder (the "Orchard Investment").

75.     At the time of this transaction, Defendant Zucker was J2's CEO, Defendant Ressler was a director and Chairman of the Board, and Loshitzer was an EVP at J2. Loshitzer has served as an EVP since 2001 and had served as J2's Chief Information Officer ("CIO") from 1997 to 2001. Significantly, Loshitzer has also been a principal of OCV since 2005.

76.     While the Company did disclose some of the conflicts of interest in connection with Defendant Ressler and Defendant Zucker, in absolutely now way did J2 Global disclose the full extent of the insider transaction and the Board's lack of independence when approving the transaction that unjustly enriched these defendants.

77.     On September 28, 2017, J2 named Defendant Shah CEO of J2 and announced that Defendant Zucker would be joining OCV as a co-managing principal – both effective January 1, 2018. The press release stated in pertinent part:

> j2 Global, Inc. (NASDAQ:JCOM) announced today that it has selected Vivek Shah to succeed Nehemia Zucker as Chief Executive Officer, effective January 1, 2018. The j2

Board of Directors believes Mr. Shah is a tested and dynamic executive capable of leading j2 Global into the future as a leading Internet information and services company with a continued focus on growth and profitability. Mr. Zucker will serve as CEO of j2 until the end of this year. On January 1, 2018, Hemi will join OCV, a venture capital firm organized by j2's Chairman of the Board, Richard Ressler.

78.     In the Form 8-K filed that same day, the Company announced the significant compensation Defendant Shah was receiving with his new role:

Effective upon assuming the position of CEO, Mr. Shah will receive an annual salary of $1,000,000 and be eligible for a target bonus under the Company's non-equity incentive compensation plan of 100% of his base salary, subject to the terms and conditions of such plan.

Additionally, Mr. Shah will be awarded a long term equity award, effective January 1, 2018, under the Company's 2015 Stock Option Plan (the "Plan") consisting of 1,000,000 shares, which will be composed of 400,000 stock options, 200,000 time-based restricted shares and 400,000 performance-based restricted shares (the "Shah Equity Award"). The exercise price of the stock options will be equal to the fair market value of a share of Company common stock on January 1, 2018. The stock options and time-based restricted shares will vest in eight equal installments on each of the eight anniversaries of January 1, 2018 (the "grant date").

79.     With his new position, it was announced that Defendant Shah realized a compensation of $45 million for 2018, as disclosed in the Company's proxy statement filed on March 22, 2019 ("2019 Proxy"). In comparison, Defendant Zucker only saw a total compensation of just over $5 Million for 2017 when he was in that same role at J2.

80.     Pursuant to an agreement between J2 and the Fund (the "Investment Agreement"), OCV uses J2 Global's money to make investments and acquisitions for the Company. Many of these subsequent investments and acquisitions have involved insiders, but contained none of the required disclosures.

81.     In addition to the Orchard Investment, J2 has been required to pay OCV millions of dollars in management fees each year pursuant to an agreement between J2 and OCV. For instance, J2 paid OCV over $36 million in 2018 and $29 million in 2019.

82.     Defendants Kretzmer, Miller, Ross, as Audit Committee members approved the Orchard Investment. J2 represented that these Defendants were "independent" when this was not true. In fact, Defendants Kretzmer and Ross had multiple, overlapping business affiliations with Ressler and each other, which was never disclosed to J2 investors.

83.     Defendant Kretzmer has been a member of the Board and a member of the Audit Committee since 2007. J2 has represented Defendant Kretzmer as an independent director. However, the Company has not disclosed in its SEC filings that Defendant Kretzmer's firm, Kretzmer Consulting, did consulting work for Orchard Capital, which owns OCV and is controlled by Defendant Ressler, between 2016 and 2017. Furthermore, in February 2018, months after approving the Orchard Investment, Defendant Kretzmer became an independent director for CIM Real Estate Finance Trust Inc. ("CIM"), a company founded by Defendant Ressler. None of this information was disclosed in J2's SEC filings to investors.

84.     In addition, Defendant Kretzmer was CEO of MAI Systems Corporation ("MAI" or "MAI Systems"), a provider of enterprise management solutions for lodging organizations. He also served as CFO of MAI from 1993 to 1996 and 1999 to 2000. While Defendant Kretzmer was CEO of MAI Systems Corporation from 1999 to 2006, Defendant Ressler was Chairman of MAI's board and Defendant Ross and EVP Loshitzer were its directors. The Company failed to disclose any of these conflicts, as required.

85.     With regard to Defendant Ross, J2 also portrayed him as independent when the opposite was true.  As mentioned above, he along with Loshitzer, and Defendants Ressler and Kretzmer were affiliated through MAI Systems. Defendant Ross also chaired a special committee at J2 that approved a reverse stock split deal that explicitly benefited Defendant Ressler, as the transaction increased Orchard Capital's ownership in MAI at the expense of public investors by

decreasing liquidity. Moreover, when the reverse stock split deal was approved, Defendant Ross's son, Avidan Ross, was employed at CIM Group, Inc. ("CIM Group"), another company co-founded by Ressler. Coincidently, Ross's son became CIM Group's Chief Technology Officer, after the approval of the transaction. CIM Group manages CIM Commercial Trust Corp. ("CMCT"), where Ressler is the Chairman, and Defendant Bech and Robert J. Cresci ("Cresci"), were also directors.[2] CMCT's headquarters are registered to the same address as Ressler's other company, OCV (4700 Wilshire Blvd., Los Angeles, CA, 90010). Again, J2 has never disclosed these relationships either.

86.     There was no legitimate business reason for the Orchard Investment. OCV had just been formed a year prior to J2's $200 million funding commitment. J2 was also already investing in numerous other companies so it didn't make sense to invest in another private equity company.

87.      In truth, the Orchard Investment was just a pattern of OCV investing in companies for the sole purpose of unjustly enriching certain of the Individual Defendants at the expense of J2 and its investors.

88.     For example, Orchard Capital invested in Universal Telecom Services, Inc. ("Universal Telecom") even though Universal Telecom dissolved in 2016. However, the investment makes sense when management is examined. At the failed company, Defendant Zucker was President and CEO, EVP Loshitzer had an officer role, and Defendant Kretzmer's consulting firm had done work for the company.

89.     Another example is Orchard Capital's investment in Presbia  PLC  ("Presbia"). Presbia went public in 2015 but filed  for  delisting  and  registration  termination  in  2019.

---

[2] Crescisi served as a J2 director from 1998 until his passing in December 2020.

Presbia's board consisted of Cresci, Loshitzer, and Defendant Ressler as well as an OCV managing principal, Mark Yung.

90.     However, the incestuous relationships that involved J2 did not end there. Defendant Zucker was a board member and the CEO of Presbia's parent company, Presbia Holdings. Loshitzer was the CEO of two entities related to Presbia: (i) PresibiBio, LLC, which had the same address as J2; and (ii) Presbia Coopertief, U.A., which used van der Weijden's personal residence at its company address.

91.     Finally, Orchard Capital invested approximately $12 million into Red Carpet Home Cinema ("Red Carpet"). Red Carpet was a new startup founded by Defendant Ressler's nephew, Benjamin Black ("Black"). Defendants Zucker and Ressler served as board members of Red Carpet. Notably, the investment by Orchard Capital was made on the very first day Red Carpet was founded therefore even before the company had any revenue. This was in breach of OCV's guidelines which reserve investments of that amount to companies which "[d]emonstrate revenue traction of $5+ million." Notably, the first capital call OCV made to J2 occurred when Black was leaving his role as a principal at OCV to become the CFO at Red Carpet.

92.     The Orchard Investment and the transactions described above are not the only related party transactions that have involved OCV and certain of the Individual Defendants. Regarding OCV's portfolio of companies, Defendant Zucker also serves on the boards of By Heart, SafeBreach, and Social Native.

93.     In sum, investors were kept in the dark that the Orchard Investment was just part of a pattern of the Individual Defendants unjustly enriching Defendants Zucker, Ressler and other Company insiders with J2's money. The Individual Defendants had a fiduciary duty to not only disclose the Orchard Investment and that J2 was paying OCV millions of dollars in management

fees, but also to fully and truthfully disclose that Company insiders were involved not only in the Orchard Investment, but that related parties were involved in the companies OCV was investing in. Due to the lack of transparency regarding the Orchard Investment, it is reasonable to infer that the transaction was an attempt by the Individual Defendants to unjustly line the pockets of the Company insiders associated with OCV.  The failure to truthfully disclose the Orchard Investment and the many interlocking relationships surrounding the transaction, in addition to the approval of the improper related party transactions themselves, were all breaches of fiduciary duties by the Individual Defendants.

### D. The Individual Defendants Cause the Company to Hide Underperforming Assets In J2's Financial Statements

94.     The Individual Defendants have also managed to hide underperforming assets by not taking impairment charges on them even after the assets failed to achieve the financial results predicted of them at the time of their purchase. This process was described in the Hindenburg Report which quoted an investor relations representative from the Company as stating "[a]ll these tuck in acquisitions, they kind just get shoved in to the broader J2 umbrella, within the business unit, within the division – and they don't really get tracked anymore. It's impossible to track revenue that derives from 'Acquisition Y' versus what was there before. And the costs of course get blended together. It's really hard to track some of these tuck-in M&A."

#### 1.     J2 Ireland

95.     J2 Ireland was a wholly owned subsidiary of J2 Holdings, an Irish company controlled by J2. On May 15, 2014, van der Weijden was appointed to be a director of J2 UK, an

arm of J2 Ireland, which was ultimately controlled by J2. Van der Weijden remained a director of J2 UK until January 13, 2016.

96.     In 2015, even though J2 Ireland took a €22.1 million charge, J2 Holdings did not take an impairment for that year, nor did it even disclose J2 Ireland's impairment for the year 2015.

97.     For the years 2016, 2017 and 2018, J2 Ireland's revenue was $101,693,900, $103,806,820, and $82,379,151, respectively. Despite this ongoing decrease in revenue, as of December 31, 2018, J2 Holdings had a goodwill balance of approximately $4.3 million. J2 Holding has not disclosed how much of that goodwill is attributable to its assets. Likewise, J2 Global has not disclosed the material underperformance of J2 Ireland from 2016 through 2018.

### 2.    Everyday Health

98.     Purchased in 2016, Everyday Health was the Company's largest acquisition. Everyday Health is a digital media company which owns a number of websites which produce health and wellness–related content.

99.     On September 30, 2016, Everyday Health's revenue for the prior twelve months was $254 million. Within the first year of J2's Global's acquisition of Everyday Health, its revenue had declined to $171 million. While Everyday Health's revenue had improved to $175 million in 2018 and further to $211.3 million in 2019, Everyday Health's revenue has never reached its pre-acquisition levels. Despite this material underperformance, J2 Global has not taken a goodwill impairment.

### E.  Certain of J2's Directors are not Independent, Even Though They are Represented As Such

100.    J2's Board members are not independent as claimed by the Company in SEC filings. Rather, multiple Board members, including those that chair and are members of the various

Board committees, have multiple business affiliations with each other outside of the Company that have never been disclosed to J2 investors.

101.    Cresci, a J2 director, served on Presbia's board from 2015 until his passing and Defendant Ressler has served on Presbia's board since at least 2015.

102.    At MAI Systems, Defendants Ressler, Ross and Kretzmer all served together. Defendant Ressler served as Board chair from 1995 to 2006; Defendant Kretzmer served as CFO twice from 1993 to 1996 and again from 1999 to 2000, as well as being CEO from 1999 to 2006; and Defendant Ross served as a director from 2001 through 2006.

103.    At Universal Telecom, Defendant Ressler served as Chairman of the Board from 1999 to 2016 during which time Defendant Kretzmer, through his consulting firm, performed work for the company.

104.    At CIM Group, Defendant Ressler co-founded the company in 1994 and serves as a principal, and Defendant Kretzmer has served as a director since 2018.

105.    At CMCT, Defendant Ressler has served as the Chairman of the board since December 2017, while Defendant Bech has served as a director since 2014 and Cresci served as a director since 2014 until his passing.

106.    The foregoing, intertwined business relationships demonstrate the lack of independence between these J2 directors, despite J2 having represented these directors as "independent" in SEC filings. Defendant Ressler has founded and/or controlled multiple companies in which Defendants Kretzmer, Ross and Bech have received substantial compensation from, compensation which is material to them. As such, there is a reasonable doubt that these directors lack independence from Ressler, as they are loyal to him and favor his interests over the interests of J2 and its shareholders.  It can also be assumed that Cresci and Defendants Kretzmer,

Ross, and Bech were only appointed to the J2 Board upon the approval of Defendant Ressler as J2 is just another company that they serve on the Board of at his behest.

107. Notably, these Defendants also serve as the majority of the Audit Committee. Defendant Kretzmer and Ross joined the Board on the same day, they have conflicts of interest as a result of working together at MAI and Universal Telecom, as well as Kretzmer profiting off work performed for Orchard Capital, and Ross' son benefiting from obtaining a position at another Ressler company. These events all occurred before Defendants Kretzmer and Ross joined the Board and were never disclosed to investors in SEC filings. Indeed, Defendant Kretzmer even removed from his own personal website information that he had done previous consulting work with OCV.

### D   The Individual Defendants Had a Duty to Disclose Related Party Transactions

108. Under applicable SEC rules and regulations, public companies, such as J2 Global, are required to file financial statements that are prepared according to Generally Accepted Accounting Principles ("GAAP") which are promulgated by the Financial Accounting Standards Board ("FASB"). This applies to both annual and interim financial statements.

109. The requirements of GAAP are codified in part in the FASB's Accounting Standards Codification ("ASC"). ASC 850 provides that "[f]inancial statements shall include disclosures of material related party transactions." This "disclosure shall include [t]he nature of the relationship(s) involved", a "description of the transactions", the "dollar amounts of the transaction", and the "amounts due from or to related parties."

110. Per SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements which are not prepared according to GAAP are presumed to be misleading. Moreover, specifically with regard to related party transactions, SEC Regulation S-X required that the "[a]mounts of related

party transactions should be stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows." In addition it provides that "[i]n cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed."

111.    According to SEC Staff Accounting Bulletin No. 99 – Materiality ("SAB 99"), a misstatement on a financial statement is considered material "if there is a substantial likelihood that a reasonable person would consider it important." Moreover, SAB 99 further provides that "intentional immaterial misstatement are unlawful."

112.    In light of the above GAAP, ASC, and SEC rules, regulations, and guidance, the Individual Defendants failed to ensure that the Company's financial statements, for which they signed certifications of accuracy, adequately disclosed a number of related party transactions that would later come to light in the Hindenburg Report.

## F.  The Individual Defendants Caused the Company to Issue False and Misleading Statements

113.    On October 5, 2015, the Company issued a press release announcing that J2 Global had closed nine acquisitions during the third fiscal quarter of 2015, including, listed under the heading, "Intellectual Property," a business called "VDW (Netherlands")." The press release stated the following, in relevant part:

> LOS ANGELES--(BUSINESS WIRE)-- j2 Global, Inc. (NASDAQGS: JCOM), the global provider of Internet services, announced today that the Company completed nine acquisitions in the third quarter of 2015. The acquisitions spanned all of the Company's business units and five countries. As a result of the recent success of its acquisition program coupled with continued operational achievements, the Company is increasing its 20 5 revenue and Adjusted Non-GAAP earnings per diluted share (EPS) guidance.

114.    This press release failed to disclose that the $900,000 acquisition of VDW (Netherlands) was an insider transaction; that the corporation was registered to van der Weijden's personal residence in the Netherlands; the corporation had no employees at the time it was acquired; and van der Weijden served as a director on J2 Global's subsidiary, J2 UK's board, prior to this transaction.

115.    On November 3, 2015, Defendant Turicchi stated on the Company's third quarter 2015 earnings call that "[w]e're extremely proud of the accomplishments of our teams during this outstanding quarter where a number of records were set…this continues to validate our overall strategy" and that "part of the art of the teams that we have built is that whether the markets are strong or weak or the economy is strong or weak, [we know] where to look to find the right kind of deals that will fit our model."

116.    Moreover, Defendant Turicchi went on to say: "[o]ur IP Licensing revenue was roughly flat at $1.1 million. Our contribution of 57% in terms of EBITDA margin I would note that as we've talked about it in the past we continue to make investments in some additional portfolios of intellectual property, which are now actually in the process of commencing their licensing program."

117.    These statements were materially false and/or misleading because they failed to disclose that at the time van der Weijden was  responsible for sourcing these deals and that  he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that the that the $900,000 acquisition of VDW (Netherlands) was an insider transaction; that the corporation was registered to Van der Weijden's personal residence in the Netherlands; the corporation had no employees at the time it was acquired; and van der Weijden served as a director on J2 Global's

35

subsidiary, J2 UK's board, prior to this transaction; because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.

118.    On February 10, 2016, on J2 Global's fourth quarter 2015 earnings call, Defendant Turicchi stated that "fiscal year 2015 provided stellar operating results, validating our business strategy of…utilizing M&A to more rapidly build these businesses to scale" and that "[o]ur M&A strategy continued to drive both revenue and margin expansion." Defendant Turicchi further stated:

> [Y]ou heard us talk about for several quarters after we bought Web24 that we've been attempting to do a small follow-on acquisition consistent with what we did, we bought KeepItSafe and with that matter when we got Campaigner out of protest. And it took a little longer than we would have liked, but the idea is to do a small transaction that is financially inconsequential. So it's very tiny in terms of its revenue, recall that Web24 itself is only about $5 million of revenue, so it's not very big. But that transaction closed and it's important in that it allows us the opportunity to go through as we do in each new business segment or business unit. What are the real stress points or issues in integration? Because for our model – the way our model works, there is a lot of key variables, but one of them is what is a fair expectation for the time of integration. If it's 30 days versus a year that may very well influence, what you are willing to pay for the business and your ultimate return on invested capital. So having the Web24 business under our ownership for about a year or over a year, we're able to finally acquire an asset. It is in the process of being integrated as we speak in fact likely by the end of this fiscal quarter if not early Q2, it should be integrated.

119.    In addition, Defendant Zucker stated that "[w]e have a healthy acquisition pipeline," and that "J2 from an M&A standpoint and from media acquisitioning versus the market will do very good in stress environment or economy."

120.    These statements were materially false and/or misleading because they failed to disclose that at the time van der Weijden was responsible for sourcing these deals and that he was

being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible; that the that the $900,000 acquisition of VDW (Netherlands) was an insider transaction; that the corporation was registered to Van der Weijden's personal residence in the Netherlands; the corporation had no employees at the time it was acquired; and van der Weijden served as a director on J2 Global's subsidiary, J2 UK's board, prior to this transaction; because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.

121.    On February 29, 2016, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Zucker, Turicchi, Bech, Kretzmer, Miller, Ressler, and Ross, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud.

122.    With respect to the Company's accounting evaluation of long-lived and intangible assets, the 2015 10-K stated the following, in relevant part:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

> We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2015, 2014 and 2013.***

(Emphasis added.)

123.    With respect to the Company's accounting evaluation of goodwill and purchased intangible assets, the 2015 10-K stated the following, in relevant part:

We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible

assets. *We completed the required impairment review for the years ended December 31, 2015, 2014, and 2013 and noted no impairment. Consequently, no impairment charges were recorded.*

(Emphasis added.)

124.    The 2015 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2015 Proxy Statement."

125.    These statements were materially false and/or misleading because they failed to disclose that at the time van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible; that the $900,000 acquisition of VDW (Netherlands) was an insider transaction; that the corporation was registered to van der Weijden's personal residence in the Netherlands; the corporation had no employees at the time it was acquired; and van der Weijden served as a director on J2 Global's subsidiary, J2 UK's board, prior to this transaction; because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.

126.    These statements were materially false and/or misleading because J2 Global's failure to note any impairment charges was the result of their improper accounting of J2 Global not taking any impairments despite the Company's acquisitions underperforming. This falsely represented that the acquisitions of J2 were adequately performing even though for example, J2 Ireland was significantly underperforming.

**G.  The Truth Begins to Emerge But the False and Misleading Statements Continue**

127.    On March 10, 2016, the truth begins to emerge when Citron Research published a report entitled "Citron Exposes the Dirty Secrets of j2 Global (JCOM)!" (the "Citron Report"). The Citron Report discussed that "J2 has been buying money-losing commoditized cloud computing companies, combining them with a nonperforming digital media strategy to inflate its top line, as EBIDTA runs in place;" and "[a]ll of [J2 Global's] acquired business in the cloud space seems to have been losing money, with negative organic growth." This put J2 Global in a position such that it "no longer wants acquisitions, it needs acquisitions." Moreover, the Citron Report revealed that "j2 Global has spent the past four years using the money generated by its legacy eFax business to prop the financials of a collection of unremarkable and/or useless assets that have all been acquired with terms undisclosed" and "[w]hile Wall Street analysis are tripping over themselves in excitement about the future of M&A at j2 Global, no one seems to be paying any attention to the bottom line or the quality of businesses j2 Global is aggregating."

128.    Despite the issuance of the Citron Report the falsehoods by the Individual Defendants continued.  On May 5, 2016, on the Company's first quarter 2016 earnings call, Defendant Turicchi again touted the companies "Q1 2016 continued to provide outstanding operating results, which continue to validate our overall business strategy of…utilizing M&A to more rapidly build these businesses to scale." He also repeated the boast from fourth quarter 2015 earnings call that the "M&A pipeline for this business and for the Backup business continues to be healthy."

129.    These statements were materially false and/or misleading because they failed to disclose that at the time van der Weijden was  responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted

him personally to close as many deals as possible. These statements also failed to disclose that J2's deals were not performing well and only appeared to be doing well through misleading accounting.

130.    On August 3, 2016, on the Company's second quarter 2016 earnings call, Defendant Zucker stated: "So basically our Rolodex of M&A helps us. And sometimes the prices that we see are very attractive because we do know the business, we don't know the people, we can promise them a fast transaction and reliable transaction without whole base." In addition, Defendant Zucker stated that, "we have bought a company called Web24 in Australia, which is web hosting. We have not done other deals so far."

131.    These statements were materially false and/or misleading because they failed to disclose that van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2's deals were not performing well and only appeared to be doing well through misleading accounting.  Moreover, the statement promoting the integration of Web24 was materially false and/or misleading due to his failure to disclose that it was overpaid for and that van der Weijden's role in acquiring it may have been motivated not by its ability to successfully integrate it with the Company but by his desire to maximize the number of deals he closed.

132.    On February 9, 2017, on the Company's fourth quarter 2016 earnings call, Defendant Turicchi stated that "[o]ur M&A strategy was critical to the overall success of this year. As you know, we completed 22 acquisitions in 2016, spent nearly $600 million, although the crown jewel of the M&A program this year was the acquisition of Everyday Health in December." Moreover, Defendant Zucker also stated that "2011 to 2016, our last five years, we achieved approximately 20% compounded revenue growth, and in the Digital Media division and combined,

achieved 70% compounded EBITDA growth. We believe that this validates our strategy of focusing on EBITDA, EBITDA generation, utilizing our organic and M&A to build our business."

133.     Defendant Zucker also specifically stated that "all the acquisitions were of relatively smaller companies, when we eliminated a number one cost, which is the platform and the engineers.  Therefore, we are generating high margins.  Also we have – our service is very fully featured. So most of the time when we acquire a company, they are exposed to the new features. And once we take them, the marginal cost to us is not very high."

134.     Defendant Zucker also stated that "we are eliminating negative margin revenues as we did in the past. If we don't believe a certain revenue has good margin potential, we will just walk away from it and focus on the profitable parts of the business. We've already reduced the combined workforce of Ziff Davis and Everyday Health by 7%. We have been steadily terminating or restructuring vendor agreements, which will add several points to the margin already now in 2017. We are undertaking many positive and profit enhancing changes that we will continue to talk about in the next quarters."

135.     Defendant Turicchi further stated on the call:

> [W]e're not going to be breaking out Everyday Health just as we don't break out IGN or the tech vertical or Ookla. But what I will say is – and remember, this is very important on the Shrink to Grow concept, it has nothing to do with Cambridge and Tea Leaves. So if you looked at Everyday Health in its totality, it had a revenue guidance/expectation last year around $250 million. We will be shrinking that revenue base by up to about $20 million based on some of the comments Hemi made earlier, where we're not finding that there is either any margin in some of those revenue streams or margins consistent with our approach.… [W]e would expect that off of that reset lower base to experience close to double digit growth with that set of assets.

136.    These statements were materially false and/or misleading because they failed to disclose van der Weijden was  responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2's deals were not performing well and only appeared to be doing well through misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials.

137.    On March 1, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Zucker, Turicchi, Bech, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud.

138.    With respect to the Company's accounting evaluation of goodwill and purchased intangible assets, the 2016 10-K stated the following, in relevant part:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is

indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31, 2016, 2015, and 2014 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

139.    With respect to the Company's accounting evaluation of long-lived and intangible assets, the 2016 10-K stated the following, in relevant part:

We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no***

> *indicators of potential impairment for the years ended December 31, 2016, 2015 and 2014.*

(Emphasis added.)

140.    The 2016 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2016 Proxy Statement."

141.    These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that the Company was not taking impairments on its assets, and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that J2 regularly overvalued acquisitions and that Everyday Health was significantly underperforming.

142.    On May 8, 2017, on the Company's first quarter 2017 earnings call, Defendant Zucker again repeated that "[w]e also successfully launched disaster recovery service and we have a strong M&A pipeline." Defendant Zucker also stated "[a]t our newest properties, Everyday Health, Media Page Today and What to Expect, we had very productive quarter with new product launches and features. Focus on productivity and profitability, we continued execution of our shrink to grow strategy. This is done by eliminating negative margin activities and eliminating low potential activities. This will result in higher EBITDA against reduced revenue."

143.    During the earnings call, Defendant Turicchi added that:

> [W]e would be in line to slightly ahead of our plans in terms of cost reduction. . . . Then there's a second piece, which is a little bit less tangible or less quantifiable, and that is evolving the understanding of how the

business is going to operate on a going-forward basis. And I'd say that's a process that takes time. . . . I'd say in the second – or the second piece of it, we're probably tracking, but it's something that takes – it takes months.

144.     Also on the earnings call, Defendant Turicchi additionally stated that:

[I]n term of our mix of M&A, it is correct. The last few quarters, with the exception of Everyday Health, most of the businesses we have bought have been very small. Part of that, I'd say, in the last five or six months has been a function that larger transactions, which we've looked at outside of Everyday Health, have been too expensive. And a lot of that has to do with the correlation to the stock markets either approaching or at all-time highs. So we've tended to focus on smaller deals.

145.     Moreover, on the earnings call, Defendant Turicchi also stated that:

Generally in the cloud, it is the goal not to grow the revenues. In fact, as Hemi will talk about or has talked about, there'll be cases where we'll actually shrink the revenues or we know there'll be revenue decline because of either expected customer attrition or customer attrition upon migration. In the Digital Media business, it usually is the concept of taking the asset, initially shrinking it down to its core, and then from that point growing its revenues.

146.     These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that the Company was not taking impairments on its assets and J2's deals were not performing well and only appeared to be doing well through misleading accounting. Moreover, these statements misrepresented and/or failed to disclose that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials.

147.     On August 3, 2017, on the Company's second quarter 2017 earnings call, Defendant Zucker boasted that "Email security and email marketing…. We are seeing in this

46

business the renewed organic growth, increasing margins and M&A." He continued that, "[t]he integration of Everyday Health and the execution of our strategy remains on target. We are continuing to develop products and building capabilities across the 3 core businesses."

148.   In answering Walter Pritchard ("Pritchard"), an analyst from Citi, Defendant Zucker and Pritchard had the following conversation:

> Pritchard:   [Y]ou entered Australia in the Backup market. That market is, organically, not really growing. As we think about sort of your confidence and it feels like you are buying more, maybe not at the rate you were a year ago there, but is that market a market you think can organically grow for the company?

> Zucker:   So on the M&A side, we had . . . 2 to 3 companies, each of them were $10 million revenue and they were bought by prices that we would never think are in our range.

149.   On the call, Defendant Turicchi reemphasized that:

> [I]n the Cloud Backup business, we're – it's an art, not a science. But $50 million to $60 million away and the view and the premise has been that, that will come from M&A. So there's been less an emphasis on the organic growth potential of that business or of that space and a much heavier focus on M&A. If you go back just a few quarters, I think from September of 2015 through probably Q3 of 2016, the Backup business had at least a dozen transactions around the world that acquired and then was in the process of integrating.

150.   Defendant Turicchi then reiterated the claim that "[t]he Everyday Health business, as you know, is in sort of in a shrink to grow mode so the numbers are really not comparable because you'd have to go back and pro forma into Q2 of 2016 revenue streams that we've now eliminated. So I'd say it's down a little bit on an actual year-over-year basis, but on a pro forma basis, would be up. And I think that once we finished the shrink to grow there and we get it down to the core, then we view it as being a consistent grower with the rest of Ziff Davis."

151.   These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for

the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2 was not taking impairments on its assets and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials.

152.    On November 2, 2017, the Company held an earnings call in connection to the release of J2 Global's financial results for the third quarter 2017. On the call, Defendant Turicchi discussed how "the M&A in Q3 was rather light. A lot of our focus not that we weren't focused on M&A, but the divestitures of Web24 and Tea Leaves were very important even though Tea Leaves actually closed in the fourth fiscal quarter, a lot of the work was done in Q3. So, the M&A transactions on the Cloud side that were done in Q3 will offset to a very modest way some of that $35 million."

153.    Later, in response to this question from Jon E. Tanwanteng from CJS Securities, Inc., "Could you just talk about the investment rationale in OCV. Do you think you can get a better return there that you can otherwise get in your core M&A strategy, just a little bit more about the decision to go that route?" Defendant Turicchi replied:

> [T]here was an opportunity through this related entity called OCV for us to make an investment and with Hemi moving over into that capacity to also give us confidence of two things, that one, there would be a focus as I'm sure that would have been anyway on delivering high returns and returns consistent with the returns that we are used to experiencing at j2, but giving us greater diversity in terms of the types of transactions that we invest in.
>
> ***
> We think that there's going to be – it will occur of course over time because their investments will have different maturity timeframes, but I think, yes

we're going to get those kinds of similar returns and we're going get exposure to other types of transactions that j2 would not find appropriate to do within the j2 structure.

154.   Defendant Turicchi added that the investment with Orchard Investment was:

[G]oing to be funded as OCV finds transactions and makes capital calls. So although it's an eight-year fund, we have assumed the more front-end loaded amount of funding you know in the tune of $50 million to $60 million dollars a year on average over the next call it four years to five years. That would exhaust the $200 million commitment. So we look at our estimated free cash flows, obviously looking out a couple of years, the dividend, and feel comfortable that that given the cash balances we already have, will be sufficient to make those capital calls and still do our M&A program.

155.   In addition, Defendant Zucker tacked on that "[w]e made cash-on-cash more than 20% a year on the Web24. So all in, it was a profitable test."

156.   These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2's deals were not performing well and only appeared to be doing well through misleading accounting. Moreover, these statements misrepresented and/or failed to disclose that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials. Moreover, the statement promoting the sale of Web24 was materially false and/or misleading due to the failure to disclose that Web24 was overpaid for and that van der Weijden's role in acquiring it may have been motivated not by its ability to successfully integrate it with the Company but by his desire to maximize the number of deals he closed. These statements also failed to disclose that the investment in Orchard Investment would personally benefit certain of the Company's directors,

49

and that the Board and the Audit Committee were composed of directors who were not independent and had overlapping business affiliations that had not been disclosed by J2.

157.   On February 6, 2018, on the Company's fourth quarter 2017 earnings call, Defendant Shah stated: "[o]ur track record has been remarkable, given the number of deals we've done" and "[o]ur organizational approach to M&A is very solid" as "[t]his design allows for a very robust pipeline across the enterprise, while ensuring we maintain our discipline."

158.   Additionally, Defendant Shah stated during the call:

> [W]e will be getting quarterly updates from OCV as to their activity, and that will be available – or at least some of that will be available directly on their website, which you can access. I think in the scheme of j2, it's actually a relatively small investment. So, if you've heard us talk about these 12 business units, the revenue they're driving and the EBITDA, that's where our focus and attention is going to be as it relates to updates. But there will be information available from time-to-time on the various investments that they are making.

159.   These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2 was not taking impairments on its assets and J2's deals were not performing well and only appeared to be doing well through misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that there was no business justification for the Orchard Investment, that the Orchard Investment would personally benefit certain of the Company's directors, and that the Board and the Audit Committee were composed of directors who were not independent and had overlapping business affiliations that had not been disclosed by J2.

160.   On March 1, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by

Defendants Shah, Turicchi, Bech, Fay, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud.

161.    With respect to the Company's accounting treatment of goodwill and purchased intangible assets, the 2017 10-K stated the following, in relevant part:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31, 2017, 2016, and 2015 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

162.    With respect to the Company's accounting treatment of long-lived and intangible assets, the 2017 10-K stated the following, in relevant part:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2017, 2016 and 2015.***

(Emphasis added.)

163.    The 2017 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2017 Proxy Statement."

164.    These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2 was not taking impairments on its assets and that J2's deals were not performing well and only appeared to be doing well through

misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that J2 regularly overvalued acquisitions and that Everyday Health was significantly underperforming.

165.    On March 23, 2018, the Company filed its proxy statement with the SEC (the "2018 Proxy Statement"), which was signed by Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross.

166.    With respect to director independence, the 2018 Proxy Statement stated that "j2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

167.    The statements were materially false and/or misleading because they misrepresented and failed to disclose that certain directors were not independent, as alleged herein.

168.    With respect to related party transactions, the 2018 Proxy Statement purported that "[t]he RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction."

169.    The 2018 Proxy Statement then disclosed the following related party transactions:

> On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the

Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy.  In February 2018, the Company received a capital call notice from the management of OCV for approximately $12.2 million, inclusive of certain management fees.

170.    These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2 was not taking impairments on its assets and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that there was no business justification for the Orchard Investment, that the Orchard Investment would personally benefit certain of the Company's directors, and that the Board and the Audit Committee were composed of directors who were not independent and had overlapping business affiliations that had not been disclosed by J2.

171.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "j2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees of j2 Global," and that "[t]he Code embodies j2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

172.    The 2018 Proxy Statement also called for Company shareholders to, *inter alia:* (1) elect eight directors; and (2) approve, in an advisory vote, the compensation of the Company's named executive officers.

173.    The 2018 Proxy Statement was false and misleading because the Code of Conduct was not followed by the Board, as evidenced by the related party transactions that were approved without full disclosures and the numerous false and misleading statements issued by the Company as alleged herein.

174.    The 2018 Proxy Statement also failed to disclose, *inter alia,* that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices, including by failing to record certain goodwill impairments; (3) many of the directors on the Company's Board had undisclosed, overlapping business relationships with one another, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

175.    The 2018 Proxy Statement harmed J2 by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting J2. As a result of the false or misleading statements in the 2018 Proxy Statement, J2 stockholders voted to re-elect Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross and voted to approve executive compensation on an advisory basis.

176.    On August 10, 2018, on the Company's second quarter 2018 earnings call, Defendant Turicchi, described the Company's policy in this way:

> …for the most part we do the tuck-in deals. I wouldn't say, they are completely immune, but I would say they are more or less immune from the market dynamics, because often there are other drivers that are influencing the sale of the assets, and there is intangible benefits that the sellers want beyond just the economic dollars, it may be an asset in a portfolio that isn't performing to the PE or VC's liking. And so, for them to be able to get it

out of their portfolio of stock allocating time and money to it, is a real benefit, beyond just what's the highest bid, and we've won deals like that, where we're not necessarily the highest bidder, we're still in obtain market multiples, but we are bringing in intangible value to the equity owners.

177.    In addition, Defendant Turicchi also stated:

…we're looking at the M&A a little bit differently maybe that we did in the past, where we are looking into portfolios where we can bring unique and differentiated value to the table, either as it relates to the seller and or is it relates to how we integrated within our existing business units. And so, we can extract value that is unique to us. so, we're not paying a bad multiple from the seller's perspective, it's just we're synergizing it down to that five times EBITDA multiple when the work is done.

178.    Defendant Turicchi also stated on the call: "On the Cloud side, we divested Web24 which was our smaller web hosting business in Australia. That had about $1.3 million in revenues in Q2 of 2017. So, combined for the company as a whole, about $11.8 million of revenues from the divested assets were present in Q2, 2017 and not in 2018."

179.    These statements were materially false and/or misleading because they failed to disclose that van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2 was not taking impairments on its assets and that J2's deals were not performing well and only appeared to be doing well through  misleading accounting.  Moreover, the statement regarding Web24 was materially false and/or misleading because J2 could have been more profitable when it divested of the Web24 Division if it had not overpaid for Web24, which was a deal sourced and managed by van der Weijden.

180.    On November 6, 2018, on the Company's third quarter 2018 earnings call, Defendant Shah declared that:

…j2's approach has proven and will continue to prove to be our most important and sustainable competitive advantage. * * * When we consider transactions, we look for fair businesses at great prices and great businesses at fair prices…we typically look to improve the company's margins through our strength through our shrink to grow program, where we identify products, initiatives and activities that are either money losing or have little to no future profit potential. We generally either sunset or sell-off those money losing components. Once we get a business to its most profitable core, we look to develop new monetization streams consistent with what we've accomplished in our other businesses. With great businesses at fair prices, we're focused on helping those businesses accelerate sales and product development. Provide access to our capital for development and tuck in acquisitions and we help them leverage our marketing assets and customer basis.

181.    Likewise, Defendant Turicchi added:

…once we get through this period where we have got the shrink to grow on some of the assets of mid-single digit. And then I think probably in equal or maybe somewhat greater amount, but on the margin of M&A for the digital media business. But as you know, a lot of those growth rates as it relates to M&A is really a function of the timing of deals and in which side of the two businesses they fall.

182.    In addition, Defendant Shah stated: "[a] great illustration of how we create value is the Everyday Health acquisition we made almost two years ago to the date. We purchased the business for $465 million, then we sold off two non-core and marginally profitable assets for $120 million."

183.    In response to a question from Rishi Jaluria, an analyst from DA Davidson, Defendant Shah elaborated that "I walk[ed] through in the prepared remarks, our experience with Everyday Health, because I thought it was important because I was beginning to get a sense from some shareholders and prospective shareholders that it was a feeling that Everyday Health wasn't working out well, and I couldn't disagree more. We are at 6.6 times EBITDA for a great asset in a great vertical, and we've done it with some real cyclical pressures. So from my point of view, the business has performed very, very well."

184.     These statements were materially false and/or misleading because they failed to disclose that van der Weijden was responsible for sourcing deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible; and that Everyday Health significantly underperformed after being acquired in December 2016.

185.     On March 1, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Shah, Turicchi, Bech, Fay, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud.

186.     With respect to the Company's accounting treatment of goodwill and purchased intangible assets, the 2018 10-K stated the following:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is performed by comparing a reporting unit's fair value to its carrying value; if the fair value is less than its carrying value, impairment is indicated. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets.

In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment review for the years ended December 31, 2017 and 2016 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

187.   With respect to the Company's accounting treatment of long-lived and intangible assets, the 2018 10-K stated the following, in relevant part:

We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2018, 2017 and 2016.***

(Emphasis added.)

188.    The 2018 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2019 Proxy Statement."

189.    These statements were materially false and/or misleading because they failed to disclose that van der Weijden was responsible for sourcing deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible; that J2 was not taking impairments on its assets and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.; that there was no business justification for the Orchard Investment and that the transaction was approved by an interested Board; an interested Audit Committee had approved the Investment Agreement; and that Everyday Health significantly underperformed after being acquired in December 2016.

190.    On March 22, 2019, the Company filed a proxy statement with the SEC (the "2019 Proxy Statement") which was signed by Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross.

191.    With respect to director independence, the 2019 Proxy Statement stated that "j2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

192.    The statements were materially false and/or misleading because they misrepresented and failed that certain directors were not independent as alleged herein.

193.     With respect to related party transactions, the 2019 Proxy Statement purported that "[t]he RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction."

194.     The 2019 Proxy Statement then disclosed the following related party transactions:

> On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy. In 2018, the Company received six capital call notices from the management of OCV for approximately $36.8 million, inclusive of certain management fees.

195.     These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2 was not taking impairments on its assets and that J2's deals were not performing well and only appeared to be doing well through

misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that there was no business justification for the Orchard Investment, that the Orchard Investment would personally benefit certain of the Company's directors, and that the Board and the Audit Committee were composed of directors who were not independent and had overlapping business affiliations that had not been disclosed by J2.

196.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "j2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees of j2 Global," and that "[t]he Code embodies j2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

197.    The 2019 Proxy Statement also called for Company shareholders to, *inter alia*: (1) elect eight directors; and (2) approve, in an advisory vote, the compensation of the Company's named executive officers.

198.    The 2019 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the related party transactions that were approved without full disclosures and the numerous false and misleading statements issued by the Company as alleged herein.

199.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices, including by failing to record certain goodwill impairments; (3) many of the directors on the Company's Board had undisclosed, overlapping business relationships with one another, rendering them not independent or disinterested; and (4) the Company failed to maintain internal

controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

200.    The 2019 Proxy Statement harmed J2 by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting J2. As a result of the false or misleading statements in the 2019 Proxy Statement, J2 stockholders voted to re-elect Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross and voted to approve executive compensation on an advisory basis.

201.    On May 8, 2019, on the Company's first quarter 2019 earnings call, Defendant Turicchi stated, in response to a question from Dan Ives at Wedbush Securities, that "we've seen continuing strength and firmness out of Everyday health, which has a large chunk of display advertising in terms of its total monetization."

202.    This statement was materially false and/or misleading because it failed to disclose that Everyday Health was significantly underperforming and that the Company was obscuring the fact through improper accounting.

203.    On August 7, 2019 on the Company's second quarter 2019 earnings call, Defendant Shah boasted that:

> I'm not sure of how many companies can make that claim to have grown revenues for 23 consecutive years. Yet, in the seven years that I've been here, and in the 20 years Scott's been here, we still get questioned about the viability of our model, questioned about our ability to sustain the j2 acquisition system, and therefore, our overall growth. I believe the past 20 years should resolve for any rational observer these questions. My favorite indicator of our success is the five times ratio of our accumulative acquisition spend divided by our annual adjusted EBITDA.
>
> ***It demonstrates our ability to stand capital intently and wisely as well as the means to properly integrate these assets once they are in j2's portfolio.***

(Emphasis added).

204.     Defendant Shah also stated that "we're certainly willing to entertain offers that value these businesses in excess of what the market may be valuing and where we may not feel it's strategic or where we way may not feel we have future growth opportunities or where we may not feel we can execute the M&A program as well. So we're open to it. We get calls from time to time. So we're certainly -- and I do think that's a little bit of a shift."

205.     These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2 was not taking impairments on its assets and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.

206.     On November 1, 2019, on the Company's third quarter 2019 earnings call, Defendant Shah stated "we have a number of high-quality, organically growing businesses where we see runway…. It's our Everyday Health group, which continues to grow organically, high single digits, possibly low double digits on the corporate fax side, on VPN." Moreover, Defendant Shah stated that "[o]ur ability to transact efficiently, transparently, and reliably and to see and create value where others cannot has allowed us to succeed in an M&A environment that can at times seem frothy."

207.     These statements were materially false and/or misleading because they failed to disclose that Everyday Health significantly underperformed after being acquired in December 2016; that at the time van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted

him personally to close as many deals as possible; and that J2's deals were not performing well and only appeared to be doing well through misleading accounting.

208.    On March 2, 2020, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Shah, Turicchi, Bech, Fay, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud.

209.    With respect to the Company's accounting treatment of goodwill and purchased intangible assets, the 2019 10-K stated the following, in relevant part:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is performed by comparing a reporting unit's fair value to its carrying value; if the fair value is less than its carrying value, impairment is indicated. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets.
>
> In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment***

> *review for the years ended December 31, 2019, 2018 and 2017 and noted*
> *no impairment. Consequently, no impairment charges were recorded.*

(Emphasis added.)

210.   With respect to the Company's accounting evaluation of long-lived and intangible

assets, the 2019 10-K stated the following, in relevant part:

> We account for long-lived assets in accordance with the provisions of
> FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"),
> which addresses financial accounting and reporting for the impairment or
> disposal of long-lived assets.
>
> We assess the impairment of identifiable definite-lived intangibles and
> long-lived assets whenever events or changes in circumstances indicate that
> the carrying value may not be recoverable. Factors we consider important
> which could individually or in combination trigger an impairment review
> include the following:
>
> - significant underperformance relative to expected historical or
>   projected future operating results;
> - significant changes in the manner of our use of the acquired assets
>   or the strategy for our overall business;
> - significant negative industry or economic trends;
> - significant decline in our stock price for a sustained period; and
> - our market capitalization relative to net book value.
>
> If we determined that the carrying value of definite-lived intangibles and
> long-lived assets may not be recoverable based upon the existence of one or
> more of the above indicators of impairment, we would record an impairment
> equal to the excess of the carrying amount of the asset over its estimated fair
> value.
>
> *We have assessed whether events or changes in circumstances have*
> *occurred that potentially indicate the carrying value of definite-lived*
> *intangibles and long-lived assets may not be recoverable and noted no*
> *indicators of potential impairment for the years ended December 31,*
> *2019, 2018 and 2017.*

(Emphasis added.)

211.    The 2019 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2020 Proxy Statement."

212.    These statements were materially false and/or misleading because they failed to disclose that van der Weijden was responsible for sourcing deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible; there was no business justification for the Orchard Investment and that the transaction was approved by an interested Board; that Everyday Health significantly underperformed after being acquired in December 2016; an interested Audit Committee had approved the Investment Agreement; and that the Company was not taking impairments on its assets.

213.    On March 26, 2020, the Company filed its 2020 Proxy Statement with the SEC which was signed by Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross.

214.    With respect to director independence, the 2020 Proxy Statement stated that "J2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

215.    These statements were materially false and/or misleading because they misrepresented and failed to disclose that certain of the directors were not independent, as alleged herein.

216.    With respect to related party transactions, the 2020 Proxy Statement purported that "[t]he RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Environmental, Social and Corporate Governance Committee (formerly, the Corporate

Governance and Nominating Committee). If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction."

217.    The 2020 Proxy Statement disclosed the following related party transactions:

> On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy. In 2019, the Company received nine capital call notices from the management of OCV for approximately $29.6 million, inclusive of certain management fees. The also Company received approximately $10.3 million in distributions from OCV in 2019.

218.    These statements were materially false and/or misleading because they failed to disclose van der Weijden was responsible for sourcing these deals and that he was being paid for the number of deals he closed not on the quality of the deals such that it benefitted him personally to close as many deals as possible. It was also not disclosed that J2's deals were not performing well and only appeared to be doing well through misleading accounting.  Moreover, these statements misrepresented and/or failed to disclose that there was no business justification for the Orchard Investment, that the Orchard Investment would personally benefit certain of the Company's directors, and that the Board and the Audit Committee were composed of directors

who were not independent and had overlapping business affiliations that had not been disclosed by J2.

219.    With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, "J2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees of J2 Global," and that "[t]he Code embodies J2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

220.    The 2020 Proxy Statement also called for Company shareholders to, *inter alia*: (1) elect eight directors; and (2) approve, in an advisory vote, the compensation of the Company's named executive officers.

221.    The 2020 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the related party transactions that were approved without full disclosures and the numerous false and misleading statements issued by the Company as alleged herein.

222.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices, including by failing to record certain goodwill impairments; (3) many of the directors on the Company's Board had undisclosed, overlapping business relationships with one another, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

223.     The 2020 Proxy Statement harmed J2 by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting J2. As a result of the false or misleading statements in the 2020 Proxy Statement, J2 stockholders voted to re-elect Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross and voted to approve executive compensation on an advisory basis.

224.     The statements referenced above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices, including by failing to record certain goodwill impairments; (3) many of the directors on the Company's Board had undisclosed, overlapping business relationships with one another, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## H.  The Truth Fully Emerges

225.     On June 30, 2020, Hindenburg Report was issued. The report discussed that "[t]he opaque nature of J2's M&A program has…left investors in the dark on the magnitude of insider enrichment and fundamental deterioration of underlying businesses." Specifically, the report states that "J2's opaque acquisition approach has opened the door to egregious insider self enrichment" to the tune of "$98 million to $128 million." The report noted that "a newly formed entity based out of [J2's] own VP of Corporate Development's personal residence for $900 thousand" which

had "undefined 'intellectual property' and no employees or apparent assets," yet "***[n]o conflict was disclosed.***" (Emphasis in original). That VP "handled 135 of J2's acquisitions, representing ~73% of the company's acquisitions to date." In addition, the Report revealed that J2's recent commitment of "$200 million of shareholder cash" was "to a newly-formed investment vehicle run by its Chairman, who has a track record of venture investment failures," as well as "other J2 execs and insiders." "That investment vehicle, in turn, made its first investment of an estimated $12 million into a newly formed home video business established by the Chairman's nephew," but "***again, no conflict was disclosed***." (Emphasis in original).

226.    The Hindenburg Report stated in pertinent part:

> **Reality Check: The Stark Reality At J2 Includes Insider Self-Dealing, An Alarming Lack Of Governance Since Inception, Looming Financial Impairments And A Legacy Business In Decline**
>
> Contrary to the picture that the company has painted, we found a vastly different reality at J2.
>
> **Related Party Transactions:** J2 and its executives have a several decades long history of related party acquisitions and undisclosed self-dealing, including:
>
> 1. Using $900 thousand in shareholder capital to acquire a newly-formed entity set up by J2's then VP of Corporate Development. The entity was headquartered at his personal residence in the Netherlands, and the conflict was never disclosed.
>
> 2. Committing $200 million of shareholder cash to the J2 Chairman's newly- formed VC firm despite a consistent track record of prior investment failures. J2 expects to commit an additional $100 million, for a total of $300 million.
>
> 3. One of the earliest investments made by the VC vehicle, an estimated $12 million, was to an entity whose incorporation documents list J2 Chairman Richard Ressler's nephew and lawyer – an indirect related party transaction. We discuss this entity in more detail below.

4. J2 Chairman's track record includes the initial backing, majority ownership, directorship and affiliated executive role in publicly traded biotech company called Presbia that itself **operated a newly-formed entity out of the exact same personal residence owned by J2's VP of Corporate Development.** That company has seen its stock fall ~99% in the last 5 years.

5. Previously, J2 had acquired yet another entity based out of the same employee's personal residence back in 2004.

To reiterate**: J2's former VP of Corporate Development had formed 3 entities out of his house that were then acquired/operated by J2 and another company headed by J2's Chairman that cost/incurred losses totaling an estimated $11 million.**

That same VP of Corporate Development was responsible for 135 M&A transactions at J2, according to his LinkedIn profile. That number represents ~73% of the acquisitions in the company's history.

J2 has historically provided limited disclosure to investors on its acquisition portfolio, raising the prospect of broader malfeasance given 1) this individual's oversight of these transactions and 2) the close ties he had with the company's Chairman. He was also integral in J2's European expansion, helping J2 acquire dozens of businesses. Contrary to sell-side perception, many of these businesses have shown significant fundamental deterioration and warrant further impairment testing.

*\*\**

In October 2015, J2 announced in a press release that it had acquired 9 businesses. Among the acquisitions, listed under "Intellectual Property" on the press release, was a company called VDW (Netherlands).

*\*\**

J2's 2015 annual report did not mention the transaction by name or give any more color on it. Since the press release tucking it in with eight other acquisitions was the only evidence we could find of the transaction, it was easy to miss.

The company only reported the initials of the entity, "VDW". Its full name, according to Dutch corporate records, is actually **Van der Weijden** M&A Consultancy BV. It was set up 11 months earlier, in December 2014, in the name of long-time J2 employee Jeroen **van der Weijden**, according to the same records. Perhaps that is why the company thought "VDW" was a better choice for its disclosures.

The company was registered to Van der Weijden's personal residence in Amsterdam (at Pieter Pauwstraat 2A-H), according to the same corporate records, and listed a total of zero employees.

\* \* \*

The company never disclosed the purchase price for VDW, but based on an analysis of the price of the other transactions that quarter we estimated the number.[] We emailed the company asking to provide the number and had not received a response as of publication.[]

Following publication, the company disclosed the purchase price. It also stated that Jeroen was a consultant not an employee, contrary to the representation on his LinkedIn profile.

We urge the company to provide shareholders and its auditors full detail on this transaction along with any additional conflicted transactions.

As we will show, this personal residence housed four different businesses: (1) J2 Global NV (2) VDW (3) Presbia (discussed below), and (4) a business run by Jeroen's brothers.

**The Acquired Entity Was Dissolved Shortly After the Employee Left the Firm**

Jeroen left J2 in 2018, according to his LinkedIn profile. The Netherlands Chamber of  Commerce registry for VDW says that the corporation had been dissolved shortly thereafter, effective October 18, 2019.

Given that Jeroen was already working for J2 as an M&A advisor, per his Linkedin Profile, we found it tremendously odd that the company acquired his M&A advisory consultancy firm, without disclosing the obvious conflict, then just dissolved the entity shortly after he left. In the company's response post- publication, it stated the dissolving corporate entities following acquisition is normal.

Lastly, and perhaps most troubling, Jeroen held key responsibility for the 135+ acquisitions he oversaw while at J2. We only went through a fraction of the deals (largely because of J2's opaque disclosures) and found obvious red flags. Per Jeroen's LinkedIn profile, he managed: *"Sourcing and handling over 135 M&A transactions, while managing all aspects of the acquisition process from scoping, planning, execution, follow up, and reporting."*

Note that J2 has completed 186 acquisitions, suggesting that Jeroen, who was apparently the beneficiary and key participant in an

undisclosed related-party transaction, was involved in over 73% of J2's acquisitions. Given that the audit committee nor the head of M&A appear to be functioning appropriately, it is our view that independent and external parties should conduct investigations on each and every one of the 135 deals that Jeroen oversaw.

\*\*\*

In 2004, J2 paid roughly $1 million to $2 million to acquire Jump B.V. [], an entity based in the Netherlands founded by its eventual VP of Corporate Development, Jeroen Van der Weijden (for context, this ~$1-2m was 1-2% of the then JCOM revenue). Per J2's filings, Jump was described as a provider of fax-to-email and unified messaging services, which fits with J2's primary focus at the time.

Per Dutch corporate records, Jump was later reorganized as J2 Global Netherlands, and was based at the exact same residential apartment that later J2 acquisition VdW was registered (along with the subsidiary of Presbia mentioned earlier)[.]

\*\*\*

We reiterate: Why did J2 and its related individuals acquire multiple entities run by the same individual based out of the same residence?

(Emphasis in original.)

227.   The Hindenburg Report also discussed the Orchard Investment stating:

**Two years after the VDW acquisition, J2 continued its string of insider self- dealing with a massive allocation of cash to an investment entity controlled by insiders**

Two years after the VDW acquisition, J2 continued its string of insider self-dealing with a massive allocation of cash to an investment entity controlled by insiders.

In 2017, J2 committed $200 million of shareholder funds to Orchard Capital Ventures ("OCV"), a venture capital fund formed in the prior year by J2's Chairman Richard Ressler. Ressler is OCV's majority equity owner despite J2 comprising almost 77% of the equity of the fund.[]

The deal was approved by J2's audit committee [], which as we detail further in Part II, likely unbeknownst to investors, appears heavily conflicted.

It might seem strange that (once again) **J2 is paying millions to its own insiders to invest in ventures**, given that **J2 is already in the business of investing in and acquiring other ventures**.

***

Given that the newly-formed OCV had no track record, we explored Ressler's track record outside of J2 in order to understand whether the massive diversion of resources to his firm was the best possible use of investor capital.

We found that Ressler's other venture investments comprised a remarkable string of investment failures, marred by signs of related-party transactions and forms of self-enrichment. A brief case study of his investment in a company called Presbia follows. (In Appendix A we break down Ressler's track record – in summary, 10/12 investments were 0s or near 0s.)

Other venture investors seem to have come to the same conclusion on Ressler's track record. In January 2018 (shortly after J2's massive allocation to OCV was signed), J2's CFO, Scott Turicchi, stated that OCV would raise a further $100m+ dollars from other investors – predominantly on the back of Ressler being a "savvy investor".[]

That interest never seemed to materialize however. Per OCV's 2020 ADV filing with the SEC, it manages around $240 million, meaning that J2's commitment likely will make up almost 85% of the firm's gross assets.

---

**Transcript from the William Blair Conference**

Q: It still doesn't make sense to me for a company that is an operating company and is successful at operating businesses, to turn into a passive investor along with (50) billion dollars, private equity dollars that are out there chasing deals, why can't you just stick to what you do?

A: Well, I think it's just another means for us to invest our capital. So I understand there may not be an agreement on that, but...

Q: Why do you think you'll be better than the other [private equity funds]?

A: It's not us by the way. It's not us. It's our capital though entrusted to particularly our Chairman, who has been a very savvy investor over a very long timeframe and the team that he's built around it under a company called OCV. So look it's a business decision that the company has made. We think it will pay off over time. We'll have to see.

Q: So why couldn't he have raised the funds himself?

A: He could. He did raise some funds independent of us.

Q: So why has this happened?

---

\*\*\*

**Inside OCV's Portfolio: An Estimated $12 Million Investment in a Niche Home Movie Business Formed By Ressler's Nephew (That Now Appears to be Dormant)**

So what investments are J2 paying OCV to manage? One example is Red Carpet Home Cinema, a niche business formed by Ressler's nephew that allows the ultra- wealthy to screen movies in their homes for a $10,000 set up fee and $1,500 per movie.

Per his LinkedIn, Richard Ressler's nephew, working for OCV as a Principal, became CFO of Red Carpet just as J2 got its first capital calls from OCV. [] He also set up the entity itself, according to California registration documents. OCV principals comprise half the board at the firm.

Red Carpet seems to also be a rather odd fit. The entity was a brand new startup with no revenue[], which violates OCV's own investment guidelines[.]

(Emphasis in original.)

228.    The Hindenburg Report commented on the numerous overlapping business relationships among members of the Board stating:

> **Corporate governance appears to be non-existent—Clear Conflicts Among Independent Board Members**
>
> The current situation at J2 has been enabled by a corporate governance vacuum. The Chairman and multiple "independent" board members, including the chairs of the audit and compensation committees, have numerous overlapping business interests, calling their actual independence into question.

## Conflicts Among "Independent" Board Members

| Company | End Result/Increase (Decrease) in Value | Richard Ressler | Brian Kretzmer | Stephen Ross | Doug Bech | Robert Cresci |
|---|---|---|---|---|---|---|
| J2 Global Position | | Independent Chairman | Independent Director/ Audit Cmte Chair | Independent Director/ Audit Cmte | Independent Director/ Comp Cmte Chair | Independent Director |
| J2 Global | TBD | ✔ | ✔ | ✔ | ✔ | ✔ |
| Presbia | (99.9%); (Delisted) | ✔ | | | | ✔ |
| MAI Systems Corp. | (99.9%) | ✔ | ✔ | ✔ | | |
| Universal Telecom Services, Inc. | Dissolved | ✔ | ✔ | | | |
| CIM Group | ~3.8% Annl Rtn | ✔ | ✔ | | ✔ | |

> 1. **"Independent" Chairman Richard Ressler** has outside business ties with much of the board, along with multiple J2 executives. As noted above, Ressler's new investment firm Orchard Capital Ventures ("OCV"), which itself is staffed with senior J2 executives, received a $200 million commitment from J2's shareholders, with the expectation that it will increase to $300 million. [] The transfer was approved by J2's audit committee [], which is Chaired by long time Ressler associate Brian Kretzmer.
>
> 2. **"Independent" director and audit committee chair, Brian Kretzmer**, has a work history with J2 Chairman Richard Ressler dating back nearly three decades.
>
> Most importantly, Kretzmer consulted for the OCV affiliate Orchard Capital. This is a **flagrant conflict of interest, given that as chair of the audit committee Kretzmer then approved the $200 million commitment of J2 Capital to OCV.**

**This conflict was not disclosed to investors. Instead, it appears steps were taken to conceal it. Kretzmer** removed his role at Orchard from his personal website, but we can see from an earlier Google cached version that Kretzmer worked on M&A for Orchard Capital:



Beyond working for the predecessor entity of a $200 million related-party transaction that he "independently" approved, Kretzmer had additional ties to Ressler. Kretzmer was CEO of IT company MAI Systems Corp while Ressler was Chairman. [] Kretzmer was also a Director at investment company CIM Real Estate Finance Trust, founded by Ressler. He also worked with telecommunications company Universal Telecom, one of Ressler's former portfolio companies.

3. **"Independent" director and audit committee member, Stephen Ross**, has a 20-year history with J2 Chairman Ressler and director/audit committee chair Kretzmer. Ross served as director at MAI Systems together with Ressler (Chairman) and Kretzmer (CEO & President). Ross's son was also employed at CIM Group, where Ressler was Chairman, eventually becoming CTO.[]

Note again that the "independent" audit committee, whose chairman and majority of its members had multiple overlapping business ties with Ressler, were responsible for providing the approval of $200 million in J2 cash being directed into Ressler's newly-formed investment entity.

Years ago, while serving at MAI systems, Ross Chaired a special committee that approved a reverse stock split deal that explicitly benefited Ressler. []

Kretzmer and Ross were hired to the J2 board on the same day 13 years ago.

4. **"Independent" compensation committee chair,** Douglas Bech, also serves as director/chairman of the corporate governance committee at CIM Commercial Trust, a business founded by J2 Chairman Richard Ressler.

**Corporate governance appears to be non-existent—Clear Conflicts Between the "Independent" Board Members and The Executives They Are Supposed to Be Overseeing**



"Independent" Board's Intertwined Interests With J2 Executives

| Company | End Result/Increase (Decrease) in Value | Richard Ressler | Brian Kretzmer | Zohar Loshitzer | Hemi Zucker |
|---|---|---|---|---|---|
| J2 Global Position | | Independent Chairman | Director / Chair Audit Cmte | EVP Strategy | Ex-CEO |
| Presbia | (99%); (Delisted) | ✓ | | ✓ | |
| MAI Systems Corp. | (99%) | ✓ | | ✓ | |
| OCV Management | $200m commitment from J2 | ✓ | ✓ | ✓ | ✓ |
| Universal Telecom Services, Inc. | Dissolved | ✓ | ✓ | ✓ | |
| Environmental Solutions Worldwide | (99%); (Delisted) | ✓ | | ✓ | |
| Vantage Surgical Systems | Quietly disappeared | ✓ | | ✓ | |
| Orchard Telecom, Inc. | Quietly disappeared | ✓ | | ✓ | |

**The company's auditor, BDO**, has collected increasing audit fees while apparently staying silent on potential conflicts and clear looming write downs. Total audit fees that J2 Global has paid to BDO have more than doubled to $4.4 million in 2019 from $2.1 million in 2016.

(Emphasis in original.)

229. The report also stating the following regarding the Company's improper accounting:

**Undisclosed Goodwill & Intangible Impairments:** Whereas J2 hasn't recognized goodwill impairments at its parent level, audits at J2's subsidiaries show a slew of goodwill impairments. We have also found signs that multiple acquisitions are clearly underperforming and likely necessitate obvious impairments that haven't been taken.

1. As one example, a key J2 subsidiary recorded an €22 million impairment despite zero goodwill impairment recognized at the parent corporation.

2. Of J2's 14 "feature" web-based brands, 9 have seen Alexa traffic rankings plummet in the past several years, making them obvious candidates for goodwill impairments.

3. Trouble with the perfect acquisition machine:
   - Everyday Health, J2's largest acquisition, saw an immediate post-acquisition revenue drop of ~25%, yet no impairment was recorded. Instead, J2 went on a spree of asset disposals/acquisitions that obfuscated the entity's financial position.
   - J2's key European subsidiary has seen its revenue decline 27% in the past 3 years, with operating income swinging from €5.2 million to negative €11.5 million.

4. VDW, a dissolved undisclosed related-party transaction that should likely be a full write-off.

5. The VC vehicle J2 has invested in has an asset that appears to be a conflicted related party. A former employee we spoke with said the operations are currently dormant and its staff have been laid off. (Note that another of the VC vehicle investments is down 50% since IPO which will reflect on the financials on a mark-to-market basis.)

Even though the company has completed $2bn of acquisitions since 2012, mostly in digital media (and cloud services businesses), J2's predominant legacy fax segment still represented 64% of LTM operating income. Last quarter, it accounted for 83% of operating income despite the time, cash, and assumed debt through J2's acquisition spree.

Approximately ~$700m of acquisitions for which we have visibility are seeing revenue declines, appear to be underperforming, or have been outright dissolved. That is approximately 1/3 of acquisitions completed since 2012 (of $2bn) – yet we have seen no impairment of goodwill to date. We estimate $155 million in impairments across this subset based on our review. If extrapolated across the acquisitions for which we have zero to little visibility the picture likely worsens.

The disproportionate underperformance of the marquee Everyday Health acquisition should round-out the need for investigation. The opaque nature of J2's M&A program has also left investors in the dark on the magnitude of insider enrichment and fundamental deterioration of the underlying businesses.

***

**Part II: Tricky Accounting: J2's Public Entity Has Never Recognized Any Goodwill Impairments**

**J2** has impairment reviews on a yearly basis, yet we see no impairments to goodwill or intangibles on its acquisitions for the last decade. []

***

Our review uncovered multiple examples of goodwill write-downs and impairments at subsidiary levels that are simply not carried up to the parent company financials. Post-publication, the company stated the lack of reported parent impairments is because "J2 assesses the fair value of goodwill at one level below the segment level which is the business-unit level."

***

**J2's Largest Acquisition, Everyday Health, Was Acquired in 2016 for $493 Million. It Saw an Immediate Annual Revenue Decline of ~25%.**

**J2 Has Yet to Record An Impairment. Instead, Everyday's Financials Have Been Obfuscated Through A Series of Acquisitions And Divestitures**

In December 2016, J2 acquired Everyday Health for $493.7 million, its largest-ever acquisition. []

***

The public financials of Everyday Health show that LTM revenue up until September 2016 (months before the acquisition) was $254 million []. The 2017 numbers declined precipitously (to $171 million), but rather than recognizing the underperformance and taking a goodwill impairment, J2 went on a spree of divestitures and acquisitions in the division that effectively obfuscated the reported metrics.

The company explained the 2017 dip by calling it a period of "shrink to grow" where it was divesting assets.

But even after factoring the 2 divestitures from that year, year over year revenue in the division declined by an estimated $65 million, or 25%.[]

***

81

Revenue in the Everyday Health division still has not reached its pre-acquisition levels despite the 5 subsequent acquisitions folded into the subsidiary.

Such a steep revenue decline seems to clearly warrant a goodwill impairment, yet the company has taken none to date.

Once again, this is J2's largest acquisition and shows clear signs of impairment. Rather than addressing it, a slew of new M&A deals have simply papered over the issue.

**Tricky Accounting: A Wholly Owned Subsidiary of J2 Reported €36 Million (~$50 Million USD) in nt Reported None. (This Shouldn't Be Possible)**

For example, subsidiary **J2 Global Holdings** is the 100% owner of entity **J2 Global Ireland**. [] The parent shows zero impairments in 2015, but the latter—a wholly owned subsidiary—shows €22 million in impairments in the exact same year. This shouldn't be possible. Post-publication, the company stated that this occurs because "J2 assesses the fair value of goodwill at one level below the segment level which is the business-unit level." The end result is that the reported parent financials don't report goodwill impairments.

\*\*\*

Cumulatively, we found 36 million Euro (~US$50 million) of impairments at the subsidiary level that did not seem to make it to J2 Ireland's parent. J2 Ireland's parent shows no impairments (or diminution) to its investments as of our latest data for the year ended 2018. Inclusive of vdW, we have identified four dissolutions of acquired entities at the subsidiary level.

\*\*\*

Filings across multiple European subsidiaries shows several acquisitions have had significant revenue declines. These European acquisitions and entities look to have been supervised by Jeroen – the key man in a series of suspicious transactions described earlier.

All told, it seems that multiple J2 European assets are deteriorating, yet we have seen no goodwill impairments recorded at the parent level.

(Emphasis in original.)

230.    The Hindenburg Report concluded as follows:

- J2 is a digital media roll-up that has acquired 186 businesses since its inception. Its CEO describes the company's "acquisition system" as its "single great competitive advantage".

- We suggest the contrary and believe J2's opaque acquisition approach has opened the door to egregious insider self-enrichment, which we approximate totals $98 million to $128 million based on publicly available information.

- For example, we uncovered that J2 acquired a newly formed entity based out of its own VP of Corporate Development's personal residence for $900 thousand. The entity had undefined "intellectual property" and no employees or apparent assets. **No conflict was disclosed.**

- The VP of Corporate Development who was on the receiving end of the payday handled 135 of J2's acquisitions, representing ~73% of the company's acquisitions to date.

- It appears to be a pattern. J2's Chairman formerly controlled a different publicly traded company alongside the noted VP, stacked with various J2 board members and insiders. Its European subsidiary racked up ~€14 million in losses despite having virtually no assets. The entity was **based out of the same personal residence** and was also acquired in part through a related party transaction with the Chairman. The stock of the parent company is down ~99%.

- J2 recently committed $200 million of shareholder cash to a newly-formed investment vehicle run by its Chairman, who has a track record of venture investment failures. The investment vehicle's leadership includes other J2 execs and insiders. J2 expects to commit another $100 million to the vehicle.

- That investment vehicle, in turn, made its first investment of an estimated $12 million into a newly-formed home video business established by the Chairman's nephew. That business is already dormant, according to a former employee. **Once again, no conflict was disclosed**.

- Despite J2's proxy describing all but one of its board members as "independent", we found decades of intertwined financial interests between board members and executives, calling that independence into question.

- Concurrently, a slowing stream of acquisitions has helped to unearth a decline in J2's key business metrics: digital traffic is down (despite support from recent acquisitions), and cloud cancel rates are ticking up with ARPU falling.

- The underperformance has been masked by tricky accounting. The company has never taken a goodwill impairment, yet subsidiary filings report multiple material goodwill impairments that don't appear to

> coincide with parent financials. We estimate at least $155 million in impairments based on visibility into $700 million in acquisitions.

> \*\*\*

> - We believe the company's audit committee simply cannot be relied upon, as a majority of the committee has worked together for years prior to serving on the board of J2 in roles that reveal conflicts of interest.
> - The "independent" board approved the cancellation of J2's dividend to "create greater shareholder returns over the near, medium and long term". This apparently includes massive loss-making capital commitments and management fees to related parties.
> - J2's young, newly minted CEO was compensated over $45 million during his first year in the role, more than the CEOs of Microsoft and J.P. Morgan, despite J2 being a fraction of the size. We can't help but wonder whether the board and executive team could be simply trading favors, in a manner consistent with J2's actions for decades.

(Emphasis in original.)

## DAMAGES TO J2 GLOBAL

231.     As a result of the Individual Defendants' wrongful conduct, J2 engaged in improper accounting, entered into improper, undisclosed conflicted related party transactions that unjustly enriched Company insiders, and disseminated false and misleading statements and omitted material information in connection therewith. The improper statements have devastated the Company.

232.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected J2 and Defendants Shan, Zucker, and Turicchi to being named as defendants in the Securities Class Action.

233.     Thus, as a result of the Individual Defendants' misconduct, J2 has sustained damages, including, but not limited to: (1) costs and expenses incurred from having to defend and possibly settle the Securities Class Action; and (2) payments incurred from the improper related party transactions that were approved by a interested and non-independent Board.

## DERIVATIVE ALLEGATIONS

234.    Plaintiff brings this action derivatively and for the benefit of J2 Global to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of J2.

235.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

236.    Plaintiff is an owner of J2 common stock and was an owner of J2 common stock at all times relevant hereto.

237.    At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross (the "Director Defendants"), along with non-defendants Scott C. Taylor and Pamela Sutton-Wallace (together with the Director Defendants, the "Directors"). Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

## A.    Demand is Futile as to All Director Defendants because the Director Defendants Face a Substantial Likelihood of Liability

238.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the improper related party transactions, wrongful accounting and the false and misleading statements in connection therewith, and as such had a fiduciary duty to ensure that the Company operated in compliance with the law. The Director Defendants also had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

239.    Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's

acted in compliance with the law, did not enter into transactions that unjustly favored Company insiders, that its internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the Company to enter into the improper related party transactions and engage in wrongful accounting and to issue the materially false and misleading statements discussed herein that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of J2 Global.

240.    Indeed, as discussed *supra,* FE1 confirmed that the Board knew about van der Weijden's role in new acquisitions and how his deals were being accounted for as FE1 was "further told that not publicly talking about new acquisitions was intentional and deliberate by the Board because then, analysts could not track individual entities, they would have to track the consolidated entity."

241.    The Director Defendants' approval of the improper related party transactions, the Company's improper accounting treatment and in connection therewith the making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties.  If the Director Defendants were to bring a suit on behalf of J2 to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**B.  Defendant Shah Is Not Independent Nor Disinterested**

242.    Defendant Shan is not disinterested and is incapable of considering a demand to commence and vigorously prosecute this action because he faces a substantial likelihood of liability as he is named as a defendant in the Securities Class Action.

243.    Defendant Shah's principal occupation is as the Company's CEO and as a Company director. Per the Company's SEC filings, the Company admits that Shah is a non-independent director. As the CEO of J2, Defendant Shah receives a substantial compensation, including $2,151,811 during 2019 for his services. This amount is material to him and he cannot impartially consider a demand against the members of the Board as they determine his executive compensation.

244.    As evidenced by his being named as a defendant in the Securities Class Action, Defendant Shah was responsible for many of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on. For these reasons, Defendant Shah is not interested nor is he independent and thus demand upon him is futile and, therefore, excused.

**C.  Defendant Bech is Not Is Not Independent Nor Disinterested**

245.    As explained above, Defendant Bech approved the false and misleading statements that omitted his relationship with Defendant Ressler. Specifically, Defendant Bech is a director along with Cresci of CMCT, where Ressler is the Chairman, and which is managed by CIM Group.  Its headquarters are registered to the same address as Ressler's other company, OCV (4700 Wilshire Blvd., Los Angeles, CA, 90010).

246.    Defendant Bech also signed and endorsed the Forms 10-K and the proxy statements that are alleged herein to be false and misleading. For these reasons, Defendant Bech is not independent or disinterested, and thus demand upon him is futile.

### D.    Defendant Kretzmer is Not Is Not Independent Nor Disinterested

247.    Defendant Kretzmer has served as a Company director since July 2007 and serves as the Chair of the Company's Audit Committee. Defendant Kretzmer served as a member of the Audit Committee at the time the Company lacked proper internal controls and the improper statements detailed herein were issued. Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal and regulatory compliance, and the integrity of the Company's financial statements and internal controls. Notably, in performing these duties, Defendant Kretzmer was required to discuss with management and the Company's independent auditor the annual financial statements, including the disclosures in management's discussions and analyses. Defendant Kretzmer was required to discuss with management and the Company's independent auditor all SEC filings before they were filed. Defendant Kretzmer breached his fiduciary duties by allowing the Company to make the improper statements discussed above and thus faces substantial likelihood of liability for his breaches of fiduciary duties.

248.    Furthermore, as explained above, Defendant Kretzmer was directly involved in the wrongdoing as he has business relationships with Defendant Ressler that were undisclosed and not shared with J2 investors. These allegations that were undisclosed to J2 investors, include:

- Orchard Capital, founded by Defendant Ressler, J2's Board Chairman, has paid Defendant Kretzmer to do M&A work.

- In February 2018, mere months after approving the Orchard Investment, Defendant Kretzmer became an independent director for CIM Real Estate Finance Trust Inc., a company founded by Defendant Ressler.

- Defendant Kretzmer also shared a long business history with Loshitzer and Defendants Ressler and Ross. Specifically, Defendant Kretzmer was the CEO of MAI from 1999-2006 while Ressler was Chairman and Loshitzer and Ross were directors.

- Universal Telecom, which was funded by Orchard Capital, was dissolved in December 2016. However, Defendant Zucker was the failed company's President and CEO, Defendant Ressler was the Board Chair, Loshitzer was an officer, and Defendant Kretzmer's consulting firm had consulted for the company.

249. Per the foregoing, Defendant Kretzmer is interested because he knew of his overlapping associations with Company insiders and yet knew that J2 was telling investors that he was an "independent" director. Defendant Kretzmer took no action to correct the false information being disseminated to the public.

250. Moreover, Defendant Kretzmer is beholden to Ressler as a result of positions he has held (and received compensation for) at Ressler controlled companies, including J2. Defendant Kretzmer was appointed to the J2 Board at the behest of Defendant Ressler and serves at his leisure. For these reasons, Defendant Kretzmer is neither independent nor disinterested, and thus demand upon him is futile.

### E.   Defendant Miller is Not Disinterested

251. Defendant Miller has served as a Company director since February 2015 and serves as a member of the Company's Audit Committee. Defendant Miller served as a member of the Audit Committee at the time the Company lacked proper internal controls and the improper statements detailed herein were issued. Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are responsible for, *inter alia,* reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal

and regulatory compliance, and the integrity of the Company's financial statements and internal controls. Notably, in performing these duties, Defendant Miller was required to discuss with management and the Company's independent auditor the annual financial statements, including the disclosures in management's discussions and analyses. Defendant Miller was required to discuss with management and the Company's independent auditor all SEC filings before they were filed. Defendant Miller breached his fiduciary duties by allowing the Company to make the improper statements discussed above and thus faces substantial likelihood of liability for his breaches of fiduciary duties.

252.    Defendant Miller, as a member of the Audit Committee approved the Investment Agreement. As alleged herein, the Investment Agreement was an agreement between J2 and the Fund, in which the Fund purportedly invested in or acquired other companies on behalf of J2 – using the funds provided by J2. However, as explained above, many of these subsequent investments and acquisitions involved Company insiders, but contained none of the required disclosures. Defendant Miller also signed and endorsed the false and misleading Forms 10-K and proxies complained of herein. For these reasons, Defendant Miller is not disinterested, and thus demand upon him is futile.

**F.    Defendant Ressler is Not Disinterested Nor Independent**

253.    Defendant Ressler has served as the Chairman of the Board and as Company director since 1997. He previously served as the Company's CEO from 1997 through 2000.  As discussed above, Defendant Ressler was directly involved in the wrongdoing as he has business relationships with Company insiders that were undisclosed and not shared with J2 investors. These allegations that were undisclosed to J2 investors, include:

- Orchard Capital, founded by Defendant Ressler, J2's Board Chairman, has paid Defendant Kretzmer to do M&A work.

- In February 2018, mere months after approving the Orchard Investment, Defendant Kretzmer became an independent director for CIM Real Estate Finance Trust Inc., a company founded by Defendant Ressler.

- Defendant Kretzmer was the CEO of MAI  from 1999-2006 while Defendant Ressler was Chairman and Loshitzer and Defendant Ross were directors.

- Orchard Capital's investment in Presbia PLC ("Presbia"), which went public in 2015, but filed for delisting and registration termination in 2019. Presbia's board included Ressler.

- Orchard Capital invested approximately $12M into Red Carpet Home Cinema ("Red Carpet"). Red Carpet was a new startup formed by Ressler's nephew (Benjamin Black) where both Defendant Zucker and Ressler served as board members.

- Defendant Ross's son, Avidan Ross, was employed at CIM Group, another company co-founded by Defendant Ressler. After the approval, Ross's son became CIM Group's Chief Technology Officer. CIM Group manages CMCT where Defendant Ressler is the Chairman, two J2 Directors, Defendant Bech and Cresci were directors, and its headquarters are registered to the same address as Defendant Ressler's other company, OCV (4700 Wilshire Blvd., Los Angeles, CA, 90010).

- Universal Telecom, which was funded by Orchard Capital, was dissolved in December 2016. However, Defendant Zucker was the failed company's President and CEO, Defendant Ressler was the Board Chair, Loshitzer was an officer, and Defendant Kretzmer's consulting firm had consulted for the company.

254.    Per the foregoing, Defendant Ressler is interested because he knew of his overlapping associations with Company insiders and yet knew that J2 was not relaying these facts to investors. Defendant Ressler took no action to correct the false information being disseminated to the public.

255.    Furthermore, Defendant Ressler is interested because he has benefited from numerous related party transactions with the Company. In 2017, the Board approved the Orchard Investment. J2 has paid an Orchard Capital affiliate, the principals of whom are Defendant Zucker, Ressler and Loshitzer, over $65 million in management fees across 2018 and 2019.

256.    Defendant  Ressler has also signed and endorsed the 10-Ks and proxies that are false and misleading as complained of herein. For these reasons, Defendant Ressler is  not independent  or disinterested, and thus demand upon him is futile.

### G.    Defendant Ross is Not Disinterested

257.    Defendant Ross has served as Company director since July 2007 and serves as a member of the Company's Audit Committee. Defendant Ross served as a member of the Audit Committee at the time the Company lacked proper internal controls and the improper statements detailed herein were issued. Pursuant to the Audit Committee's Charter, the members of the Audit Committee were and are responsible for, *inter alia,* reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal and regulatory compliance, and the integrity of the Company's financial statements and internal controls. Notably, in performing these duties, Defendant Ross was required to discuss with management and the Company's independent auditor the annual financial statements, including the disclosures in management's discussions and analyses. Defendant Ross was required to discuss with management and the Company's independent auditor all SEC filings before they were filed. Defendant Ross breached his fiduciary duties by allowing the Company to make the improper statements discussed above and thus faces substantial likelihood of liability for his breaches of fiduciary duties.

258.    Defendant Ross also served as the chair of a special committee that approved a reverse stock split proposal that specifically increased the value of Defendant Ressler's stockholdings, as alleged herein and as such Defendant Ross is beholden to Defendant Ressler.

259.    Defendant Ross, as a member of the Audit Committee approved the Investment Agreement. As alleged herein, the Investment Agreement was an agreement between J2 and the

Fund, in which the Fund purportedly invested in or acquired other companies on behalf of J2 – using the funds provided by J2. However, as explained above, many of these subsequent investments and acquisitions involved Company insiders, but contained none of the required disclosures. Defendant Ross also signed and endorsed the false and misleading Forms 10-K and proxies complained of herein. For these reasons, Defendant Ross is not disinterested, and thus demand upon him is futile.

## <u>FIRST CLAIM</u>
### Against Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross for Violations of Section 14(a) of the Securities Exchange Act of 1934

260.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

262.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

263.    Under the direction and watch of the Directors, the 2018, 2019, and 2020 Proxy Statements (the "Proxy Statements") failed to disclose *inter alia,* that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

264.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, and an advisory vote for the approval of executive compensation.

265.    The false and misleading elements of the Proxy Statements led to, *inter alia,* the re-election of Defendants Shah, Bech, Fay, Kretzmer, Miller, Ressler, and Ross.

266.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

267.    Plaintiff on behalf of J2  has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

268.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

269.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of J2 Global's business and affairs.

270.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

271.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of J2 Global.

272.    In breach of their fiduciary duties owed to J2 Global, the Individual Defendants willfully or recklessly caused the Company to approve improper related party transactions that enriched Company insiders, engage in improper accounting practices, and in connection therewith made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements

were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties. Also, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

273.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them.

274.     These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

275.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, J2 Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

276.     Plaintiff on behalf of J2 Global has no adequate remedy at law.

### THIRD CLAIM
### Against Defendant Ressler for Unjust Enrichment

277.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

278.    By his wrongful acts, violations of law, and false and misleading statements and omissions of material fact that he made and/or caused to be made, Defendant Ressler was unjustly enriched at the expense of, and to the detriment of, J2 Global by the alleged improper party transactions alleged herein, specifically the Orchard Investment. Defendant Ressler benefitted financially from his improper conduct.

279.    Plaintiff, as a shareholder and a representative of J2 Global, seeks restitution from the Defendant Ressler and seeks an order from this Court disgorging all profits obtained by Defendant Ressler due to his breaches of fiduciary duty and other violations of law.

280.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of J2 Global, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to J2 Global and other violations of law;

C.    Determining and awarding to J2 Global the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Awarding J2 Global restitution from the Individual Defendants, and each of them;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court may deem just and proper.

Dated: March 24, 2021                           Respectfully submitted,

                                                */s/ Blake A. Bennett*
                                                **COOCH AND TAYLOR, P.A.**
                                                Blake A. Bennett (#5133)
                                                The Nemours Building
                                                1007 N. Orange Street, Suite 1120
                                                Wilmington, Delaware 19801
                                                Telephone: (302) 984-3800
                                                Email: bbennett@coochtaylor.com

                                                *Attorney for Plaintiff*

**OF COUNSEL:**
BRAGAR EAGEL & SQUIRE, P.C.
Garam Choe
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (646) 860-9449
Email: choe@bespc.com

HYNES & HERNANDEZ, LLC
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (914) 752-3041
Email: mhynes@hh-lawfirm.com
        lhernandez@hh-lawfirm.com